7 Cal.App.4th 1240 (1992)
9 Cal. Rptr.2d 521
In re CANDIDA S. et al., Persons Coming Under the Juvenile Court Law.
RICHARD O'NEIL, as Director, etc., Plaintiff and Respondent,
v.
SHELBY S. et al., Defendants and Appellants.
Docket Nos. H007959, H008674.
Court of Appeals of California, Sixth District.
July 1, 1992.
*1242 COUNSEL
Estelle A. Schleicher, under appointment by the Court of Appeal, for Defendants and Appellants.
Steven M. Woodside, County Counsel, and Donald J. Fallon, Deputy County Counsel, for Plaintiff and Respondent.
George W. Kennedy, District Attorney, and Penelope M. Blake, Deputy District Attorney, for Minors.
[Opinion certified for partial publication.[*]]
*1243 OPINION
COTTLE, Acting P.J.
After a contested six-month review hearing held pursuant to Welfare and Institutions Code section 366.21, subdivision (e)[1] in a dependency proceeding regarding the four minor children of Rebecca and Shelby S., the juvenile court found that reasonable reunification efforts had been offered to Rebecca and Shelby and that they had not successfully satisfied the reunification plans. The court scheduled a 12-month review hearing pursuant to section 366.21, subdivision (f) for January 16, 1991. Each parent separately appeals from the decision. (No. H007959.) Shelby argues (1) section 366.25, rather than 366.26, applied to these proceedings because the children were adjudged dependent on December 5, 1988; (2) the court's determination that reasonable efforts had been made to assist him with reunification was erroneous because (a) it was not supported by the evidence, (b) the reunification plans were unreasonable, (c) the court held the parents to a reunification plan different from the one they signed, and (d) the court failed to advise Shelby that he would be protected by use immunity if he admitted to sexual abuse. Rebecca joins in Shelby's arguments and adds two additional arguments: the court erred in failing to order visitation and in failing to appoint separate counsel for each minor.
During the pendency of the appeal, the 12-month review hearing pursuant to section 366.21, subdivision (f) was held. The court terminated further reunification services, found that three children, Candida S., born January 12, 1979; Arthur S., born January 9, 1983; and Theodore S., born February 23, 1984, were unadoptable and established a permanent plan of long-term foster care for them, and set a section 366.26 hearing for the fourth child, Mary S., born September 30, 1980, to select and implement a plan of adoption, legal guardianship, or long-term foster care. The parents also appeal from this order. (No. H008674.)[2] They argue the court committed reversible error (1) by finding that reasonable reunification services had been offered to the parents, (2) by failing to order return of the children to the parents, and (3) by denying visitation. They also argue (4) that Shelby's success in therapy illustrates the harm caused by the failure to conduct timely interim reviews, and (5) the children's best interests will be served by continuing reunification services. For reasons we shall explain, we conclude that none of the parents' contentions require reversal. Accordingly, we affirm the orders following the six-month and twelve-month hearings.

*1244 FACTUAL AND PROCEDURAL BACKGROUND
On August 9, 1988, the director of the Early Learning Center in Palo Alto filed a suspected child abuse report with the Palo Alto Police Department alleging that Arthur had four marks on his side caused by his father, that Theodore hid in corners, was fearful and wet his bed, that Mary showed signs of sexualized behavior, and that all four children came to school without socks, unbathed, and with their hair unwashed.
When an investigation was done, the home was found to be filthy, "unsuitable for human habitation." The crime report indicated that Mary had been the victim of repeated sexual molests by a babysitter in 1983 and that the Milpitas Police had inactivated the case due to the passage of time and the fact that the mother was uncooperative. Mary received no therapy after the molest. Two years later, Mary was again the victim of repeated sexual abuse, this time by her mother's brother, who lived with the family. The referral to the police was not made by Mary's parents. Rather, the uncle confessed to his psychiatrist who reported it. Mary again received no therapy.
The minors were taken into protective custody. While in emergency foster care, the minors made allegations of sexual abuse involving their mother, their father and a roommate of the S. family. The parents denied sexually abusing their children.
On August 12, 1988, a petition was filed for each of the four minors alleging that he or she came within the provisions of section 300, subdivision (a) because the father had used a belt to discipline the children, Arthur had bruises on his body from being grabbed by his father, and the home was filthy.
On October 28, 1988, four supplemental petitions were filed, adding allegations of sexual abuse of the minors by the parents, an uncle and a tenant.
On December 5, 1988, the jurisdictional hearing was held. The court sustained the petitions as to each minor following the parents' submission of the matter on the court record without testimony. Disposition was saved for a later date. At the conclusion of the findings, the court stated, "All children  all four children are declared dependent children of the court at this time."
The dispositional hearing was held March 2, 1989, at which time the minors were ordered suitably placed and ordered to have no contact with *1245 their parents or anyone involved in the molest. The court found the petitions "sufficient under current law," adjudged the minors dependent, set a semiannual review hearing for August 3, 1989, made an initial service plan, and continued the matter for receipt of a service and visitation plan.
On March 28, 1989, Shelby and Rebecca signed the family reunification service plan. Relevant portions of the plan provide: "1. Reason for court action: ... Said minors were sexually molested at the family residence by the parents, the uncle, and by a tenant. [¶] 2. Problem summary: (1) Parents' denial/inability to take responsibility for abuse. [¶] (2) Inadequate understanding of the dynamics/impact of physical/sexual abuse on the family and a child's growth and development.... [¶] 3. Objectives for problem areas; to be accomplished by 9/1/89. [¶] (1) To provide a safe, secure home environment, one free from physical/sexual abuse, as evidenced by therapist(s) and supervising social worker. [¶] (2) To demonstrate awareness/insight into the effects of physical/sexual abuse of your children and the resulting special needs/interventions, as evidenced by therapist(s) and supervising social worker.... [¶] 5. Planned actions by parents: [¶] (1) Participate in a program of individual/couple/family counseling specific to issues of domestic violence/physical/sexual abuse. [¶] (2) Participate in group counselling at ICEF. [¶] (3) Enroll/complete a Parenting course. [¶] (4) Maintain residence in a clean, sanitary, wholesome manner."
A hearing was held on May 12, 1989, to evaluate whether parental visitation should be allowed. The court-appointed psychologist, Dr. Paul Popper, and the individual therapists for each of the minor children all agreed that visitation would not be in the minors' best interests. Dr. Popper suggested that before the children could be returned to their home, it would be necessary for Shelby "to admit his sexual abuse of the children and become actively involved in treatment focused on this," and for Rebecca to "relinquish her role of protecting the father, encourage him to admit his sexual abuse of the children and then participate with him in the treatment he receives focused on his sexual abuse behavior." The court ruled that previous orders remained in full force and effect and continued the parental visitation hearing to coincide with the six-month review on August 3, 1989.
In the meantime, Shelby and Rebecca entered the therapy program with Institute for the Community of Extended Family (ICEF) which was part of their reunification service plan. ICEF required parents, after a certain number of therapy sessions, to admit sexual molestation of their children. Because Shelby and Rebecca refused to do so, they were denied further access to the program.
*1246 The parents chose instead to pursue counseling with Carol Marks, a therapist associated with VOCAL (Victims of Child Abuse Laws), an organization focusing on false accusations of child molest. The parents continued to deny any molestation.
The six-month review scheduled for August 3, 1989, was continued nine times, once to relieve the public defender as attorney of record, once to get progress reports from the minors' previous therapists, once because Rebecca's counsel wanted to prepare an alternative reunification plan, and other times for discovery. The hearing eventually commenced on January 31, 1990. Because of the number of witnesses that were called to testify, the hearing convened a total of 20 days, beginning January 31 and ending June 27, 1990. Relevant testimony from the hearing will be discussed as it relates to specific issues.
Because the last day of the 6-month hearing occurred some 15 months after the dispositional hearing, the court and the social workers initially assumed the hearing was a 12-month review. In its decision, however, the court clarified that the 20-day hearing was an interim review. The court ruled that reasonable reunification efforts had been offered to the parents and that they had not successfully satisfied the reunification service plans. The court scheduled a section 366.21, subdivision (f) (12-month review) hearing for January 16, 1991, and ordered the following additional reunification services: "7. The family will continue to receive services from the Family Reunification Program for the next 60 days. [¶] 8. The Reunification Program will be as follows: [¶] a. The assigned social worker will provide to the parents at least 3 referrals for therapists to assist them in addressing the issue of sexual abuse in their family and their denial of that abuse. [¶] b. The social worker will facilitate communication between the therapist from these referrals the parents choose to consult and the children's therapists. [¶] c. The parents will immediately upon receipt of the referrals make arrangements to meet with one of the therapists referred by the social worker. [¶] d. The parents will meet with this therapist on a regular basis for the next 60 days. [¶] e. The social worker will arrange for the therapist to receive all relevant information from the court file, including all court reports, Dr. Johnston's report, Dr. Popper's report, the reports from the children's therapists and any other information necessary to effective therapy with these parents. [¶] f. The social worker will arrange for the therapist consulted to prepare and submit to the Court a report on the parents progress on the issue of denial of the sexual abuse in their family."
Pursuant to the court's directive, the parents began receiving weekly psychotherapy sessions in mid-November from Dr. Michael Jones. He submitted a report to the court dated January 5, 1991, in connection with his *1247 assignment, i.e., "working on the parents' denial," indicating that he had met with Rebecca and Shelby weekly, had consulted the minors' therapists and the social worker and had reviewed numerous court documents including prior mental health evaluations. He "came to the firm conclusion that both Mr. and Mrs. [S.] do, in fact, have personality structures conducive to the use of denial  in fact, I feel that it is probably their primary mode of defense." Dr. Smith continued, "In spite of the tremendous neglect, physical mistreatment and sexual abuse the children have suffered, it is my professional opinion that the [S.'s] are capable of eventually `letting go' of much of their denial, particularly Mrs. [S.]." He recalled a "significant therapeutic breakthrough": "Mrs. [S.] reminded her husband that on one occasion he had inappropriately touched his oldest girls' [sic] genital area while she was nursing Mary in the other room. At this time Candida was about two or three years old and came running to her mother saying that her father had hurt her. Under pressure from his wife, Mr. [S.] apparently apologized and promised never to touch her this way again."
Based on this breakthrough, Dr. Jones recommended "that the next logical step will be for all therapists to meet together to discuss how best to proceed formulating a psychologically sound therapeutic family visit which will have the highest probability of helping the children heal emotionally. At this time, I believe any family visits should be with just one child at a time and that the therapeutic value of these visits should be reviewed on a visit by visit basis. Thus, if visits go well, then they should be extended; however, if once involved in therapy with any of their children the [S. parents] are unable to take appropriate responsibility, then visits should be terminated."
The January 16 hearing was continued a number of times, permitting Dr. Jones to issue an update on February 5, 1991. In that update, he advised the court that Shelby had "recalled another inappropriate incident, this time with his daughter Mary. This incident consisted of Mr. [S.] entering Mary's bedroom at night and pulling down her underpants, at which time his wife entered the room and asked what he was doing. While neither parents has a specific recollection of inappropriate touching  it appears that Mrs. [S.] arrived before any such behavior could have occurred  and both parties agree that there was no legitimate reason for Mr. [S.'s] behavior. For example, Mary had not wet the bed, did not suffer from any medical problems at that time, etc." He concluded: "I would again like to suggest a meeting with all the therapists ... to explore the benefits of having the [S.'s] meet with their children in order to take full responsibility for their actions and to validate the children's allegations against them."
The section 366.21, subdivision (f) hearing was finally submitted for decision on May 9, 1991, on the basis of Dr. Jones's and the social worker's *1248 reports. In its May 30, 1991, decision, the court maintained jurisdiction for all four children, found that return to the parents would create a substantial risk of detriment to the minors' physical and emotional well-being, and found that reasonable reunification services had been provided. Candida, Arthur and Theodore were found to be unadoptable and the court established a plan of long-term foster care for them. The court set a section 366.26 hearing for Mary for September 26, 1991.

DISCUSSION

I

No. H007959  Six-month Review

A. When Were the Minors Adjudged Dependent Children?
Shelby argues that the court erred in determining that the minors were adjudged dependents on March 2, 1989, and that "[t]his erroneous determination has an immediate adverse effect on the parents in that the matter is positioned to proceed pursuant to the expedited process of Welfare and Institutions Code Section 333.26 instead of the process contained in Welfare and Institutions Code Section 366.25 which contemplates extra substantial and procedural rights of Civil Code Section 232." (Fns. omitted.)[3]
At the December 5, 1988, jurisdictional hearing, the court stated: "All children  all four children are declared dependent children of the court at this time." However, in its decision following the six-month review, the court clarified, "Although the minute orders reflect that the court made a finding of dependency at the December 5, 1988 Jurisdictional hearing, this appears to be an error as disposition was not actually accomplished until March 2, 1989 at which time the Court made specific dispositional findings and orders and set the first Semi-Annual Review for August 3, 1989." We agree that the adjudication of dependency occurred on March 2, 1989.
Before minors may be adjudged dependents, the court must first "receiv[e] and consider[] the evidence on the proper disposition of the case...." (§ 360; see also Cal. Rules of Court, rule 1456: Following receipt and consideration of the evidence concerning the proper disposition, "the court *1249 may ... (4) Declare dependency...."[4]) The court did not receive or consider evidence on the proper disposition of this case until the dispositional hearing on March 2, 1989. While a court may combine jurisdictional and dispositional hearings, it did not do so in this case because the parents requested time for a psychological evaluation. (See rule 1451.)
At the March 2, 1989, dispositional hearing, the court, in addition to adjudging the minors dependents of the court, made a specific finding that the petitions were "sufficient under current law," specifically, that the minors were persons "described by [revised] Welfare and Institutions Code Section 300 d, j." This determination would not have been necessary had the children been declared dependents in December 1988. Former rule 1360, in effect from January 1, 1989, until January 1, 1990, required: "(b) If a jurisdiction hearing occurred on or before December 31, 1988, sustaining a petition under the subdivision lettering of section 300 then in effect and if the disposition hearing does not occur until after January 1, 1989, the court shall determine if the facts in the sustained petition are sufficient to declare the child a dependent under section 300 as revised...." If so, the court is required to identify which particular subdivisions of the revised section 300 apply. (Ibid.)
(1) One may not appeal from the jurisdictional finding that a minor is a person described by section 300. It is only from the adjudication of dependency, which occurs at the dispositional hearing, that one may appeal. (In re Tracy Z. (1987) 195 Cal. App.3d 107, 112 [240 Cal. Rptr. 445].) Here, the adjudication of dependency took place on March 2, 1989. Accordingly, this case is governed by the law applicable to minors adjudged dependent on or after January 1, 1989.

B. Did the Court Err in Finding That Reasonable Reunification Services Had Been Offered to the Parents?[*]
.... .... .... .... .... .... .... .

C. Was the Court Required to Advise the Parents of Use Immunity?
(2) Shelby's final contention is that the court was required to advise him that he would be protected by use immunity if he admitted to sexual abuse. We disagree. It is true that "any admissions [a parent] makes during the course of treatment ordered as part of the reunification plan would be immune from use in criminal proceedings ... against him." (In re Lamonica *1250 H. (1990) 220 Cal. App.3d 634, 650 [270 Cal. Rptr. 60].) This does not mean, however, that the court has a duty to advise the parent of the immunity.
There are certain rights about which a court must advise a parent at a jurisdictional hearing. These are set forth in rules 1412 and 1449. One of the rights is "the right to assert the privilege against self-incrimination." Shelby and Rebecca, each of whom was represented by separate counsel, were advised of this right at the jurisdictional hearing.
In In re Lamonica H., supra, 220 Cal. App.3d 634, 649-650 and in In re Jessica B. (1989) 207 Cal. App.3d 504, 517-521 [254 Cal. Rptr. 883], the fathers were each required by their respective reunification plans to admit abuse of their children and to seek treatment based on such admission. On appeal, each argued that the court's requirement violated their right against self-incrimination. Relying in part on section 355.1, subdivision (d) ("Testimony by a parent, guardian, or other person who has the care or custody of the minor made the subject of a proceeding under Section 300 shall not be admissible as evidence in any other action or proceeding") and in part on Ramona R. v. Superior Court (1985) 37 Cal.3d 802, 808 [210 Cal. Rptr. 204, 693 P.2d 789] (statements made in a fitness hearing or to a probationer by 17-year-old girl charged with murder were immune from use at subsequent trial), the In re Jessica B. court held that "[t]he California Constitution requires that a person proceeding simultaneously in the criminal courts for child abuse and the juvenile court regarding a dependency of the abused minor should not only be granted use immunity for his or her testimony at dependency proceedings that constitutes an admission to the acts at issue in the criminal case against him or her but also for such statements made during court-ordered therapy. Under the circumstances of this case, such an immunity is essential to the constitutional privilege against self-incrimination and facilitates the goal of protecting the best interest of the minor and achieving the reunification of the family at the earliest possible date." (207 Cal. App.3d at p. 521.) Thus, the reunification plans were held nonviolative of the privilege against self-incrimination.
Likewise in the instant case, the parents were required by their reunification plan to admit to molestation and to seek treatment based on this admission. As in In re Lamonica H., supra, and In re Jessica B., supra, this requirement did not impair their right against self-incrimination because any admissions would have been subject to use immunity.
Neither In re Lamonica H. nor In re Jessica B. required the trial court to explain the parameters of the use immunity to the fathers. As in this case, the fathers were at all times represented by counsel. But unlike this case, where *1251 the criminal proceedings had already been concluded, charges were still pending against the father in In re Lamonica H. and charges had not yet been filed in In re Jessica B. If no admonition was required in those cases, it was clearly not required in this case. The court was under no duty to advise Shelby and Rebecca of use immunity.

D. Did the Court Err in Failing to Award Visitation to the Parents?[*]
.... .... .... .... .... .... .... .

E. Was the Court Required to Appoint Separate Counsel for Each Minor?
Throughout these proceedings, public funds have been expended to pay for (1) the county counsel (for the department of social services), (2) appointed counsel (for Shelby), (3) separate appointed counsel (for Rebecca), and (4) the district attorney (for the four minors). (3a) Rebecca contends that three more attorneys should have been appointed so that each child could have had his or her own counsel. She claims a conflict existed among the minors because some wanted to visit their siblings while others did not, and the failure to appoint separate counsel was prejudicial because the court failed to make any order regarding sibling visitation. (At the same time she concedes "the issue of sibling visitation was never raised by the minors' attorney or addressed by the court.")
(4) Rebecca correctly observes that every presumption and intendment must be indulged in support of the correctness of the judgment. (Rossiter v. Benoit (1979) 88 Cal. App.3d 706, 712 [152 Cal. Rptr. 65].) Thus she argues, based on a statement to the same effect in In re Elizabeth M., supra, 232 Cal. App.3d 553, "a presumption arose that the trial court impliedly found that an order for sibling visitation was not in the best interests of the children." We disagree. The only presumption that arose is that the issue was not raised and therefore was not part of any order. Neither Shelby nor Rebecca nor the minors requested an order of sibling visitation. Perhaps this is because the evidence suggested they were already seeing each other. The two girls lived together until shortly before the hearing and the two boys were still living together. Evidence was presented that the brothers and sisters also saw each other. Thus, even if we determined that the failure to appoint independent counsel was error  a position we do not take  the failure would be harmless with respect to the sibling visitation issue.
(3b) Rebecca relies heavily upon In re Elizabeth M., supra, 232 Cal. App.3d at pages 565-570 for the proposition that each of the children *1252 should have had separate counsel. Although we agree with many of the points discussed in that opinion, we must take exception with others. (5) We agree, for example, that the right to independent counsel in dependency cases is purely statutory, not of constitutional dimension, and subject to harmless error analysis upon review. (Id., at p. 567; § 317, subd. (c) ["In any case in which it appears to the court that the minor would benefit from the appointment of counsel the court shall appoint counsel for the minor...."].) The appointed counsel may "not represent another party or county agency whose interests conflict with the minor." (§ 317, subd. (c).) We also agree that a parent has standing to assert his or her child's right to independent counsel because independent representation of the children's interests impacts upon the parent's interest in the parent-child relationship. (In re Patricia E. (1985) 174 Cal. App.3d 1, 6 [219 Cal. Rptr. 783], disapproved on other grounds in In re Elizabeth M., supra, 232 Cal. App.3d at pp. 566-567 and in In re Mario C. (1990) 226 Cal. App.3d 599, 606 [276 Cal. Rptr. 548].)
In In re Elizabeth M., supra, 232 Cal. App.3d at pages 565-566, the court's starting point was that a "potential conflict of interest among the children appears in the record" (italics added), based on the following facts: Servando, Jr. wanted to return to his parents; Jonathan still lived with them; Eric wanted to maintain his relationship with them; Daniel was attached to his father; Margaret had been removed at a young age and had bonded with her foster family; and Elizabeth also had bonded with foster parents. Servando, Sr., argued that counsel for Servando, Jr., Eric, and Jonathan might have advocated reunification services and termination of dependency while counsel for Elizabeth, Daniel and Margaret might have advocated against being reunited.
We believe the In re Elizabeth M. court began with the wrong starting point. (3c) The test is not whether there is a "potential conflict of interest" before a juvenile court is required to appoint separate counsel for a minor. The test is whether there is an "actual conflict of interest." (In re Richard H. (1991) 234 Cal. App.3d 1351, 1367 [285 Cal. Rptr. 917].)[7]
Having first identified that a "potential conflict of interest among the children appears in the record," the In re Elizabeth M. court then "determine[d] whether the record reflects a miscarriage of justice in the failure to appoint separate counsel." (232 Cal. App.3d at p. 568.) It found no miscarriage of justice "even if the court did err in failing to appoint independent *1253 counsel" on the issue of a permanent plan for the minors because all the seminal facts were brought to the court's attention. (Id., at pp. 568-569.) With respect to the sibling visitation issue, however, the court concluded that "the error [in not appointing separate counsel] was not harmless." (Id., at p. 570.)
Our problems with the In re Elizabeth M. decision are twofold. First, the court went through a harmless error analysis without ever determining there was an actual conflict of interest. The facts as recited do not indicate that an actual conflict of interest existed. We believe that proceeding immediately to the harmless error analysis is putting the cart before the horse. If there was no error, i.e., if there was no actual conflict of interest requiring the appointment of separate counsel, then there was no need to determine whether the "error" resulted in a miscarriage of justice.
The only evidence presented in In re Elizabeth M. and the only evidence presented here is that some of the children wanted visitation and others did not. However, the obligation of counsel for a dependent minor is to pursue whatever is in the minor's best interest. This may or may not be what the minor wishes. Nothing would preclude counsel from informing the court that one child wants visitation and another does not. It would then be up to the court to determine whether there should be any visitation and, if so, with whom, the frequency and length of visitation. (Cf. In re Jennifer G. (1990) 221 Cal. App.3d 752 [270 Cal. Rptr. 326].) In the absence of any further facts, nothing in this record rises to the level of an actual conflict of interest requiring appointment of independent counsel.[8]
Second, the In re Elizabeth M. court required the juvenile court to issue an order on sibling visitation when no one requested an order for continuing visitation[9] and when the evidence indicated informal visitation among the siblings was already taking place.
The court determined that a specific order on sibling visitation was necessary, even in the absence of a request for such an order, and that *1254 evidence that informal visitation was taking place did not satisfy the court's obligation in this respect. For this proposition, the court relied upon the statement in In re Jennifer G., supra, 221 Cal. App.3d 752, that "the power to regulate visitation rests in the court, and the court may not delegate this function to the department of social services." (In re Elizabeth M., supra, 232 Cal. App.3d at p. 570, paraphrasing In re Jennifer G. at p. 757.)
However, In re Jennifer G. involved parental visitation, and the law requires that every order placing a minor in foster care and ordering reunification services provide for visitation between the parent or guardian and the minor as frequently as possible consistent with the minor's well-being. (§ 362.1.) In In re Jennifer G., the trial court improperly delegated this duty to the department of social services. There is no similar requirement to make an order on sibling visitation. This does not mean the court should not consider whether sibling visitation is in the child's best interest. (6) To the contrary, "the statutory scheme which requires the court to consider the best interests of the child in dependency proceedings includes an implicit requirement that the court consider whether continuing sibling visitation is in the child's best interests." (In re Elizabeth M., supra, 232 Cal. App.3d at p. 569; see also § 202, subds. (a), (d).) Nor does this mean that the court cannot make an order for sibling visitation whenever to do so would protect the best interests of the child. However, where, as here, visitation is taking place and no one requests a formal order for continuing visitation, the court does not err in failing to make such an order sua sponte.

II[*]

No. H008674  12-Month Review
.... .... .... .... .... .... .... .

III

DISPOSITION
The judgment is affirmed.
Bamattre-Manoukian, J., and Stone, J.,[] concurred.
A petition for a rehearing was denied July 23, 1992, and appellants' petitions for review by the Supreme Court were denied September 11, 1992.
NOTES
[*] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts IB. and ID. and all of part II.
[1] Unless otherwise noted, all further statutory references are to the Welfare and Institutions Code.
[2] The order with respect to Mary is not appealable but it may be subject to review by extraordinary writ. (See § 366.26, subd. (k); In re Michelle M. (1992) 4 Cal. App.4th 1024 [6 Cal. Rptr.2d 172].) Because the issues will be addressed in the context of Mary's siblings' appeal, we will treat her appeal as a writ.
[3] Section 366.25 is applicable to minors adjudged dependents before January 1, 1989, while section 366.26 is applicable to minors adjudged dependents after December 31, 1988. Under the old law, before parental rights could be terminated, a separate judicial proceeding under Civil Code section 232 had to be initiated.
[4] All further references to rules are to the California Rules of Court.
[*] See footnote, ante, page 1240.
[7] California Rules of Professional Conduct, rule 3-310 states the rule against representing adverse interests as follows: "(B) A member shall not concurrently represent clients whose interests conflict, except with their informed written consent.... [¶] (D) A member shall not accept employment adverse to a client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment except with the informed written consent of the client or former client."
[8] Our review is necessarily limited by a record where the issue was neither raised nor ruled upon. In order to facilitate meaningful review and provide guidance below, we believe the best course would be as follows: if a potential conflict of interest among the minors arises, and if the issue is raised by any party, the court should hold a hearing to determine whether an actual conflict exists requiring the appointment of separate counsel.
[9] The court acknowledged that "counsel for Servando Sr.... did not specifically request an order on the matter separate from parental visitation." (232 Cal. App.3d at p. 564.) However, it determined that the following statement by Servando's counsel was sufficient to defeat the department's claim that the issue had been waived: "`I know it's difficult and it's an unusually difficult situation mechanically speaking for the department to get five kids together, get a social worker together, get the parent together, get hopefully young Jonathan together, that they can all be some place to have contact with each other, but I think all the kids benefit from it, whatever happens.'" (232 Cal. App.3d at p. 564, fn. 7.)
[] Judge of the Santa Clara Superior Court sitting under assignment by the Chairperson of the Judicial Council.