108 Cal.Rptr.2d 527 (2001)
90 Cal.App.4th 107
In re ZETH S., a Person Coming Under the Juvenile Court Law.
Orange County Social Services Agency, Plaintiff and Respondent,
v.
Stacy S, Defendant and Appellant.
No. G027568.
Court of Appeal, Fourth District, Division Three.
June 22, 2001.
Review Granted October 10, 2001.
*528 Jennifer Mack, Charlottesville, VA, under appointment by the Court of Appeal, for Defendant and Appellant.
Laurence M. Watson, County Counsel, and Robert G. Overby, Deputy County Counsel, for Plaintiff and Respondent.
Melissa A. Chaitin, under appointment by the Court of Appeal, for the Minor.

OPINION
SILLS P.J.

I
The remarkable thing about this juvenile dependency case is the diametrically opposite positions taken by the two attorneys who, respectively, have been minor's counsel at trial and on appeal. At the Welfare and Institutions Code section 366.26 hearing (.26 hearing) held in May 2000, involving then-27-month-old Zeth, minor's trial counsel was adamantly in favor of the termination of parental rights. The minor's trial counsel, in fact, led the charge against mother Stacy, usually being the first to object to questions from Stacy's counsel that would have shown that Zeth had a strong relationship with his mother.[1] Zeth's trial counsel was the most aggressive lawyer in the cross-examination of his mother, relentlessly emphasizing that Stacy had had a relapse into taking illegal drugs in March.[2] And in oral argument at the .26 hearing, Zeth's trial counsel confidently assured the court that Zeth's then current caretaker, his maternal grandfather, was "ready, willing and able to adopt."
It is a different story on appeal, where Zeth's independent appellate counsel now supports the mother. In her letter brief, the minor's appellate counsel has informed the court that the grandfather "felt pressure *529 to adopt Zeth" and would rather be his legal guardian. Minor's appellate counsel's letter brief emphasizes the strong bond between mother Stacy and her child, reminds the court that Stacy continues to assume "primary parental responsibilities" of taking care of Zeth in the home of the maternal grandfather, and urges reversal of the order terminating parental rights. The letter brief also states that minor's appellate counsel conferred with both the case social worker and minor's trial counsel as part of her investigation.
California Rules of Court rule 39.1A(f) provides that minor's counsel's appellate briefs are due 20 days after the respondent's brief is filed ("unless minor's counsel is granted leave to file the minor's brief at a different time"), so county counsel did not have an opportunity to respond to minor's appellate counsel's revelation. We requested further briefing to provide that opportunity.
Before we address county counsel's position, it must be noted that, even without the allegation that the caretaker had been pressured into agreeing to adopt Zeth,[3] Stacy presented strong evidence at the .26 hearing that she fit within the over-litigated and usually unsuccessful (c)(1)(A) "benefit exception,"[4] at least insofar as the requirement of fulfilling a "parental role" is concerned. (See In re Beatrice M. (1994) 29 Cal.App.4th 1411, 1418-1419, 35 Cal.Rptr.2d 162.) Zeth had been placed with Stacy's own father, so the usual logistical problems of visitation did not prevent her from being her child's primary caregiver. There was uncontroverted evidence at the .26 hearing that she fed him, cooked meals for him, bathed him, dressed him, read a bedtime story and put him to bed, and taught him the alphabet, colors, shapes, and numbers. That was in addition to the "fun things" that she did with her child (go the pool or the park, play with the child's toys, play catch, go to the pet shop, toy store and mall). There was evidence that the child preferred to be bathed by his mother rather than one of the grandparents. Likewise he wanted his mother whenever he was hurt or sick, and when she wasn't home Zeth would ask for his mother.
We must now reverse and send the case back for an "updated review hearing." (See In re Eileen A., supra, 84 Cal. App.4th at p. 1259, 101 Cal.Rptr.2d 548 [analogous procedure in cases of ineffective assistance of counsel]; In re Arturo A. (1992) 8 Cal.App.4th 229, 245, 10 Cal. Rptr.2d 131 [same].) The new information brought to the attention of this court by the minor's appellate counsel calls into question the position taken by minor's counsel at the trial level, and raises the possibility of a miscarriage of justice. Had minor's trial counsel sided with the parent in this case based on the new information, in all likelihood there would have been a dramatically different result in the .26 hearing"more probable than not," in the language usually used to describe ineffective assistance of counsel. (See In re Kristin H. (1996) 46 Cal.App.4th 1635, 1668, 54 Cal.Rptr.2d 722, quoting People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.)

*530 II
In its supplemental brief, arguing against any remand, county counsel stresses one point: Because the law is that an identified adoptive family need not be "waiting in the wings" (In re Jennilee T. (1992) 3 Cal.App.4th 212, 223, fn. 11, 4 Cal.Rptr.2d 101 [first use of phrase in context of .26 hearing]; see also In re Lukas B. (2000) 79 Cal.App.4th 1145, 1154, 94 Cal.Rptr.2d 693; In re Sarah M. (1994) 22 Cal.App.4th 1642, 1649, 28 Cal.Rptr.2d 82), the fact that the grandfather might have been pressured into stating he wanted to adopt Zeth rather than be his guardian is irrelevant to the issue of whether Zeth was "adoptable" within the meaning of section 366.26, subdivision (c).[5] Zeth is still quite adoptable; ergo the fact that his caretaker did not really want to adopt him makes no difference to the termination of Stacy's rights.
County counsel's argument fails because it does not take into account the fact, as we show in detail in part III of this opinion, that the Legislature has conferred a special role on minor's counsel. That role is only part advocate. It is also part watchdog, and part referee. Let us be plain: Minor's counsel serves a special and unique role in dependency jurisprudence, and a judge or hearing officer, acting as trier of fact, is likely to be influenced by the position taken by minor's counsel. The new evidence that the grandfather was "pressured" into stating a preference for adoption could very well have prompted minor's trial counsel to change their position, and that in turn would have changed the whole focus of the .26 proceeding, and certainly might have led to a different result.

III
The duties of minors' counsel are set by section 317 of the Welfare Code, subdivisions (c) [initial appointment of minor's counsel, requirement that counsel shall "advocate for the protection, safety, and physical and emotional well-being of the minor"] and (e) [detailing specific duties, including interviewing and other investigation].
The statute is remarkable in that it requires minor's counsel to be proactive in investigating the minor's best interest. The statute specifically requires minor's counsel to conduct an independent factual investigation into what position accords best with the minor's welfare and then report the results of that factual investigation to the court: Counsel "shall make ... further investigations ... necessary to ascertain the facts, including the interviewing of witnesses ...." (§ 317, subd. (e), emphasis added.) If the child is four years old or older, counsel must interview the child "to determine the child's wishes and to assess the minor's well-being, and shall advise the court of the minor's wishes." (Ibid.) Counsel also "shall investigate the interests of the minor beyond the scope of the juvenile proceeding and report to the court other interests of the minor that may need to be protected by the institution of other administrative or judicial proceedings." (Ibid., emphasis added.)
These statutory duties to conduct a factual investigation and report to the court necessarily confer on minor's counsel in dependency cases a special role in American *531 jurisprudence. The situation where a lawyer is required by statute to investigate and report to the court on behalf of his or her client so that the court can take action to protect the interests of that client is unusual, to say the least. Even more unusual is a statutory prohibition against a lawyer arguing a certain position. Under section 317, the lawyer is forbidden to argue for the return of a child to his or her parent under certain circumstances. (§ 317, subd. (e).)[6] And on top of those anomalies, there is the further requirement, well established in the common law, that minor's counsel must use his or her independent judgment in arriving at the position to "advocate," despite the stated preferences of the "client." (See In re Eileen A., supra, 84 Cal.App.4th at p. 1262, 101 Cal.Rptr.2d 548 [emphasizing need for minor's counsel to exercise independent judgment]; In re Candida S. (1992) 7 Cal.App.4th 1240, 1253, 9 Cal. Rptr.2d 521 ["the obligation of counsel for a dependent minor is to pursue whatever is in the minor's best interest. This may or may not be what the minor wishes."]; In re Richard H. (1991) 234 Cal.App.3d 1351, 1368, 285 Cal.Rptr. 917 ["the preference of the minor is not determinative of his or her best interests"].)
Minor's counsel is special also because the minor's counsel necessarily acts a "neutral" litigant in the sense of being only concerned about the child. Triers of fact must necessarily be skeptical about the other parties and the positions advocated by their lawyers. Parents have reasons for seeking return of their children that aren't always "pure": Guilt, pride, or simple possessiveness too often motivates parents in dependency cases, as well as a natural desire to be with their offspring. On the other hand, social service agencies are subject to their own sets of bureaucratic rules and dynamics which, on occasion, also conflict with a child's best interests. (See generally Los Angeles County Dept. of Children etc. Services v. Superior Court (1995) 37 Cal.App.4th 439, 43 Cal. Rptr.2d 757 [chastizing children's services agency and its counsel for opposing plan by foster parent to send child for an out-of-state vacation].)[7]
*532 It should thus be fairly obvious that of all the parties who appear in a juvenile dependency proceeding, it is the minor's counsel who functions closest to a quasijudicial capacity.[8] The minor's counsel's role is reminiscent of the court's own role in a so-called inquisitorial justice system, where judges rely on experts and investigators who are not chosen by the parties.[9] *533 Indeed, judging simply by the plain text of section 317, subdivision (e), the most important function of minor's counsel is to determine the particular position that best accords with the child's interests.
Moreover, given human nature, the minor's counsel's special role tends to confer on minor's counsel a special credibility with the court qua trier of fact. A juvenile court judge could reasonably assume that the minor's counsel had performed his statutory duty to investigate (cf. Civ. Code, § 3548 [general presumption that the "law has been obeyed"]) and would therefore enjoy a certain confidence that any ruling consistent with the position of the minor's counsel would be one which, at least in minor's counsel's opinion, would not result in physical harm to the minor.[10] Needless to say, it is the worst nightmare of every judge who works on a dependency case (including, we dare say, appellate judges) that a return of a child to a parent will result in harm to the child.[11]
Finally, the statute makes no differentiation between minor's trial counsel and minor's appellate counsel. If anything, the statutory duty to "investigate the interests of the child beyond the scope of the juvenile proceeding and report to the court other interests of the child that may need to be protected by the institution of other administrative or judicial proceedings" is a clear indication that minor's counsel's investigative role extends to appellate counsel. The Legislature must have intended that minor's counsel act as a final check on any placement made by the social service agency.

*534 IV
Given the special role of minor's counsel, both trial level and appellate, the very position taken by the minor's attorney is going to carry de facto some independent weight with the trier of fact. And we dare say that, in a razor-close case, the position taken by minor's appellate counsel will also carry at least some weight with the Court of Appeal.
Of course, the mere fact that an appointed appellate counsel changes position from that of the minor's counsel by itself comes nowhere close to establishing grounds for reversal. Trial and appellate counsel may simply have an honest disagreement about the best interests of the child, and given that equilibrium, the usual appellate presumptions in favor of the trial court judgment would certainly be dispositive.
In this case, however, there is evidence of a nature that furnishes a concrete reason for the change of position. That evidence is clearly relevant to a change of circumstances warranting a change in a prior order because the best interests of the child demand it. (In re Eileen A., supra, 84 Cal.App.4th at pp. 1261-1262, 101 Cal.Rptr.2d 548.) The evidence also casts doubt on the actual resolution of the conflicting evidence at the .26 hearing regarding the applicability of the benefit. Had minor's trial counsel apprised the trial court of the pressure put on the grandfather to adopt, and of the grandfather's stated preference to be a guardian so that his daughter could continue to have the legal status as Zeth's mother, we cannot say that the judgment before us would be the same.

V
Thus far we have proceeded on the assumption that minor's appellate counsel's statement in her letter brief concerning the caretaker's real preference is accurate, even though it has not been made in a declaration under oath. The obvious issue that arises is how appellate courts should treat such information, which is not going to be in the appellate "record," given that it arrives without the usual safeguards of the law of evidence.
Manifestly, it is not the proper province of appellate courts to determine facts. The instances when appellate courts actually take "evidence" (cf. Code Civ. Proc, § 909; Cal. Rules of Court, rule 23) are extremely rare, and it would be safe to say that appellate courts are loath to use the power they have. (See generally Eisenberg et al, Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2000) ¶¶ 5:168 to 5:184, pp. 5.44.2 to 5-45.) But, as the Eisenberg Rutter Group Practice Guide notes, there is an exception in the area of juvenile dependency appeals, where at least "some courts will routinely accept additional evidence." (Id. at ¶ 5:184, p. 5-46, citing In re Jonathan M. (1997) 53 Cal.App.4th 1234, 1236, 62 Cal.Rptr.2d 208.)
But there can be no doubt about the need to take into account post-judgment developments in juvenile dependency cases, where the subject matter of the litigation is, after all, a child's life. The static model of appellate evaluation of a judgment based on settled and discrete facts that works well in almost all other areas of law does not always work well when the object of the litigation is the ongoing well-being of a child. (See In re Arturo A., supra, 8 Cal.App.4th at p. 243, 10 Cal.Rptr.2d 131 [no "static conditions" in juvenile dependency law].) The consequences to the child are too grave if an adoptive placement is not "working out," yet a judgment affirming the termination of the relationship between the child and his or her natural parents is routinely affirmed. *535 If an adoptive placement doesn't work out, the result can be catastrophic to the child. Legal orphanage is the worst of all possible outcomes: No parents and no adoptive home.
The problem is how to evaluate the evidence of such post-judgment developments, without undoing the basic structure of appellate procedure. Is it enough, for example, that appellate counsel put the information in a letter brief?
There are grave consequences on the opposite side as well. As this court pointed out in In re Cristella C. (1992) 6 Cal. App.4th 1363, 1372, 8 Cal.Rptr.2d 342, there are cases where the erroneous non termination of parental rights is worse than the erroneous termination. (Cristella involved far different facts than the case here: The child was born addicted to drugs, and no parental relationship ever developed; reversal of the judgment would in all likelihood have led to the loss of a stable and permanent home.)
In light of the dangers of erroneous termination or erroneous nontermination, something more than just a statement in a brief (the functional equivalent of an offer of proof) would appear to be necessary before an appellate court should reverse the termination of parental rights in the wake of a change of position by the minor's counsel which casts doubt on the result of the .26 hearing. (See Smith, Smith & Kring v. Superior Court (1997) 60 Cal. App.4th 573, 578, 70 Cal.Rptr.2d 507 [matters in points and authorities are not evidence].) Accordingly, we conclude that information concerning new developments submitted by appellate counsel on appeal in juvenile dependency cases should be made pursuant to rule 23 of the California Rules of Court, which, by a cross-reference to rule 41, requires "affidavits or other evidence" in its support. If the appellate court concludes that the new developments (which will usually concern some aspect of the minor's placement in a prospective adoptive home), if found true on remand by a trial court, would otherwise warrant a reversal of the order terminating parental rights, the case should be remanded to the trial court for an updated review hearing in order to assess the child's current status.
The updated review would, in effect, be a retrial of the .26 hearing, this time with presumably better information on both adoptability and the possible application of the benefit exception. (See In re Eileen A., supra, 84 Cal.App.4th at p. 1259, 101 Cal.Rptr.2d 548 [analogous procedure in cases of ineffective assistance of counsel]; In re Arturo A, supra, 8 Cal.App.4th at p. 245, 10 Cal.Rptr.2d 131 [same].) If the matter turns out to be a false alarm,[12] another order terminating parental rights is the logical outcome of the retrial of the .26 hearing. If not, the court can make the appropriate order under section 366.26. Additionally, the pendency of the appeal would allow the parent to bring a section 388 motion if appropriate.
There is civil precedent for this procedure, as it parallels the procedure of an application for a writ of error coram vobis, where a party asks for a writ from the appellate court directing the trial court to reconsider new evidence discovered during the pendency of the appeal for the purpose of reopening the judgment. (See generally Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs, supra, at ¶¶ 5:191 to 5:191.3, pp. 5-46 to 5-48; see also In re Derek W. (1999) 73 Cal.App.4th 828, 831-832, *536 86 Cal.Rptr.2d 742 [rejecting formal application for writ of coram vobis based on new evidence that child was part Cherokee]; Betz v. Pankow (1993) 16 Cal. App.4th 931, 941, fn. 5, 20 Cal.Rptr.2d 841 [explaining difference between coram nobis (writ directed to trial court) and coram vobis (writ directed to appellate court)].)[13]
By sending the matter back for an evidentiary hearing, the problem of the minor's appellate counsel becoming, in effect, the star witness, is avoided as well. (Cf. Smith, Smith & Kring, supra, 60 Cal. App.4th at p. 578, 70 Cal.Rptr.2d 507 ["Where a lawyer representing a party in trial is also a witness during the trial, his or her effectiveness, both as a lawyer and as a witness, may be impaired in the eyes of the fact finder."]) On remand, however, the attorney's affidavit or declaration becomes the functional equivalent of an offer of proof, and the real witnesses become the caretaker, social workers, and parents or other third parties.

VI
The minor's counsel's brief in this case, however, was written in light of the previous practice of this court to accept statements made in minor's appellate counsel's briefs as true. (E.g., In re Jonathan M., supra, 53 Cal.App.4th at p. 1236, fn. 2, 62 Cal.Rptr.2d 208; see also In re Eileen A., supra, 84 Cal.App.4th at p. 1262, 101 Cal. Rptr.2d 548.) Most of the time this practice has made it easier for the court to affirm terminations of parental rights in close cases, because of the reassurance of minor's appellate counsel that the adoptive placement is working out, the child is happy in his or her new home, and the goals of permanency and stability are being, in fact, achieved. The present case, by contrast, is the rare close case where the balance tips in favor of reversal.
In fairness to minors' counsel who may have already submitted appellate briefs without the requisite declaration required by rules 23 and 41 of the California Rules of Court, our opinion in regard to that requirement should, of course, be taken as prospective only. (See Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal.3d 287, 305, 250 Cal.Rptr. 116, 758 P.2d 58 [protecting reliance interests of plaintiffs who may have already initiated suits based on decision being overruled].) In any event, however, we must reverse this termination of parental rights because of the doubts raised about the outcome of the .26 hearing by the minor's appellate counsel's brief. The matter is remanded to the juvenile court for an updated review hearing in the form of a retrial of the .26 hearing.
BEDSWORTH and O'LEARY, JJ, concur.
NOTES
[1] E.g., "Q. By [the juvenile defender representing the mother]: Does he [Zeth] ever say to you that he would like to come with you? [¶][Minor's trial counsel]: Objection, leading.... Q. [By mother's counsel]: Do you ever have the opportunity to send him gifts or letters or anything like that [¶] [Minor's trial counsel]: Objection; leading."
[2] A point made with a vengence by sheer repetition: E.g., "Q. [By minor's counsel]: You are a drug addict; right?.... [¶] Q. So were you thinking about your son in March when you were out there shooting up heroin?.... [¶] Q. Is it fair to say that your addiction is stronger than your love for your child?.... [¶] Q. You just used two months ago?.... Q. Shot heroin? [¶] Q. But with that in the balance, you couldn't stop using drugs?"
[3] This is at least the second time this sort of thing has come to the attention of this court. (See In re Eileen A. (2000) 84 Cal.App.4th 1248, 1259-1260, 101 Cal.Rptr.2d 548.)
[4] The (c)(1)(A) "benefit exception" refers to subdivision (c)(1)(A) of section 366.26 of the Welfare and Institutions Code. For a discussion of why it is so often litigated, see In re Eileen A., supra, 84 Cal.App.4th at p. 1255, fn. 5, 101 Cal.Rptr.2d 548. All statutory references in this opinion, unless otherwise designated, are to the Welfare and Institutions Code.
[5] Indeed, the reciprocal point (absence of adoptive parents waiting in wings is no basis to conclude a child isn't adoptable) is embedded in the text of section 366.26, subdivision (c)(1): "The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."
[6] One dependency scholar worries that the advocacy restriction unfairly impinges on the minor's preferences, and in any event works generally to the detriment of parents in dependency proceedings. (See Patton, Legislative Regulation of Dependency Court Attorneys: Public Relations and Separation of Powers (1998) 24 J. Legis. 3.) Professor Patton notes that section 317, subdivision (e) sets forth a triple combination of requirements. Minor's counsel must: (a) investigate, (b) tell the court the minor's wishes but (c) not advocate for the minor's return if "to the best" of counsel's "knowledge," return conflicts with the "protection and safety of the minor." Hence there is the anomaly that a minor's counsel who tells the court that the child desires to return home but doesn't "advocate" that position will be, in effect, functioning as a witness directly contrary to the express wishes of his or her client. (See Patton, Legislative Regulation of Dependency Court Attorneys: Public Relations and Separation of Powers, supra, 24 J. Legis. at pp. 6-8.)
[7] Under section 317, it is theoretically possible that county counsel, who normally represent social workers, might also be appointed to represent the minor. (See In re Richard H., supra, 234 Cal.App.3d at pp. 1367-1370, 285 Cal.Rptr. 917 [no prejudicial error where county counsel represented both minor and social services agency in case of severe physical abuse because there was no "actual" conflict of interest].) Interestingly enough, however, the key feature in Richard H.'s determination that there was no actual conflict was the inability of the parent to "suggest any factual matters which independent counsel [for the minor] might have presented to the court." (Id. at p. 1370, 285 Cal.Rptr. 917, emphasis added.) That would make sense, given the context of Richard H.an appeal from a dispositional order removing two children after one of the children had sustained brain damage. The opinion, however, should not be read more broadly than that. The Richard H. court never considered a situation, such as postdispositional foster placement, where an actual conflict between county counsel and the minor's best interests could possibly arise.

In contrast to Richard H., a number of juvenile dependency trial judges and hearing officers have suggested that there is an inherent conflict between representing social service agencies and the children they are supposed to provided services for. The lead case on the point is Los Angeles County Dept. of Children etc. Services v. Superior Court (1996) 51 Cal.App.4th 1257, 59 Cal.Rptr.2d 613 (hereinafter, "Dept. of Children"), which arose out of an attempt by a county board of supervisors to save money by having lawyers from the county counsel's office also represent children. The Court of Appeal denied a writ petition to force the juvenile court to appoint county counsel lawyers to represent "all" dependent children. (See id. at p. 1259, 59 Cal.Rptr.2d 613.) Along the way, the court recounted, at length, the testimony to the grand jury of a number of juvenile court judges and hearing officers to the effect that county counsel is inherently not well positioned to represent minors. (See id. at pp. 1268-1270, 59 Cal.Rptr.2d 613.)
While our opinion today takes no position on the Richard H.-Dept. of Children problem of whether county counsel always face a conflict of interest in representing children, it is enough to remark that it is hard to imagine a situation where a conflict won't arise once there has been a dispositional order removing a child from a parent's home. It is at that point that social workers are faced with the hard task of placing a dependent child in foster care, and in doing so they are subject to manifold, conflicting pressures, including tight budgets. County counsel is necessarily faced with the task of defending those placements. Yet the statutory role of the minor's counsel to "investigate the interests of the minor beyond the scope of the juvenile proceeding" clearly contemplates the monitoring of foster care placements. (See In re Robert A. (1992) 4 Cal. App.4th 174, 191-192, 5 Cal.Rptr.2d 438 [emphasizing the importance of giving the minor's attorney notice of postdispositional changes in foster placement because notice is a logical corollary of the minor's counsel's duties to "obtain current information from his or her client" so as to obtain "the court's assistance in rectifying a placement that does not serve the child's best interests"].)
[8] Beginning with In re Danielle W. (1989) 207 Cal.App.3d 1227, 1234, 255 Cal.Rptr. 344, a number of cases have casually referred to the social service department as an "arm of the court," usually in the context of the discretion committed by the court to the department in implementing placement or visitation arrangements for dependent children. (See id. at p. 1235, 255 Cal.Rptr. 344; see, e.g., Department of Social Services v. Superior Court (1997) 58 Cal.App.4th 721, 739, 68 Cal. Rptr.2d 239 [placement supervision]; cf. In re Donnovan J. (1997) 58 Cal.App.4th 1474, 1476, 68 Cal.Rptr.2d 714 [contrasting delegation of overseeing visitation to department with delegation of task to private therapist].) The characterization, when limited in context to matters such as the implementation of the juvenile court's own orders concerning placement or visitation, makes sense, so we express no disagreement with it. But it cannot seriously be contended that the county social service agencies, which are part of the executive branch of government and which regularly instigate juvenile dependency proceedings opposed by parents, are "the court" for purposes of any substantive decision making. Plainly, juvenile dependency proceedings are still adversarial, usually pitting the government against parents. In the broad context of the juvenile dependency system as a whole, county social service agencies are no more an "arm of the court" than the district attorney's office is in the context of criminal prosecutions. By contrast, the Legislature has crafted duties for minor's counsel which substantively come much closer to making that counsel an "arm of the court."
[9] For a quick overview of so-called "inquisitorial justice," see Erichson, Mass Tort Litigation and Inquisitorial Justice (1999) 87 Geo. L.J.1983: "Although the `inquisitorial' systems of the various civil law countries differ from each other in significant ways, they share certain attributes that give the adversary parties less control over the adjudication process than in the United States, and that give the court correspondingly greater control, [¶] The inquisitorial court has primary responsibility for investigating the facts. . . . [¶] Civil law judicial systems rely heavily on experts, but consistent with the notion that the judge has primary responsibility for investigating the facts, they do not rely much on experts chosen by the litigants." (Id. at pp.2006-2007, fns. omitted.) The jumping off point of Professor Erichson's article is that when American courts select and use neutral experts in mass tort litigation, such as breast implant cases, they are engaging in an approach that "resembles" continental inquisitorial justice. (See id. at p.2009; cf. Hall v. Baxter Healthcare Corp. (D.Or.1996) 947 F.Supp. 1387.)
[10] This is a variation on Professor Patton's point discussed in footnote 6, ante, to the effect that the very position taken by minor's counsel signals the results of the counsel's factual investigation to the judge.

While the role of minor's counsel as de facto witness creates interesting academic questions and jurisprudential anomalies, it appears that is the way the Legislature wants the system to work. The statutory prohibition against minor's counsel's advocacy of any return to the parents if, "to the best of counsel's knowledge," it conflicts with the child's safety and protection, was the product of the well-publicized Lance Helms case, where a two-year old boy was alleged to have been murdered by the father's girlfriend after he had been returned home. (See Patton, Legislative Regulation of Dependency Court Attorneys: Public Relations and Separation of Powers, supra, 24 J. Legis. at p. 6.) Members of the Legislature perceived the minor's counsel to have "`failed'" the child. (Ibid.) While we certainly agree with Professor Patton that section 317, subdivision (e) creates a variety of anomalies in the context of an adversarial system, including "transforming] the child's attorney into a fact-finder" (ibid.) we do not necessarily agree that it is a bad thing. In the special role of minor's counsel, an attorney not only helps prevent a child's return to a parent where there is a danger of harm, but can also monitor the social service agency's provision of foster care. (Cf. In re Robert A., supra, 4 Cal.App.4th at pp. 191-192, 5 Cal. Rptr.2d 438.)
[11] See also Patton, Legislative Regulation of Dependency Court Attorneys: Public Relations and Separation of Powers, supra, 24 J. Legis. at p. 7 [noting "an ever-growing external political pressure upon judges to be over-protective of children"].
[12] We will of course presume that appellate counsel who bring such developments to the court's attention do so in good faith, even if a trial court were to find that the representation to the Court of Appeal were overstated.
[13] To the degree that a remand for an updated review hearing in the light of the new information arguably relaxes the traditional extrinsic fraud requirement for the coram vobis writ, that relaxation is the logical product of the exigencies of juvenile dependency justice. Where a child's and a family's future is at stake, adherence to a strict common law "extrinsic fraud" requirement is unseemly. Given the tremendous volume of dependency cases (see Blanca P. v. Superior Court (1996) 45 Cal.App.4th 1738, 1758-1759, fn. 18, 53 Cal.Rptr.2d 687), there is too high a likelihood that trial counsel will simply not have the time to do the kind of "discovery" that would reveal, for example, the precise nature of the relationship between a dependent child and his or her caretaker. The present case may indeed turn out to be in that category.