Filed 10/31/13  In re Hannah W. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re HANNAH W., et al., Persons Coming Under the Juvenile Court Law. | B244464 (Los Angeles County Super. Ct. No. CK95097) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JENNIFER W.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  D. Zeke Zeidler, Judge.  Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

\* \* \* \* \* \*

The juvenile court sustained a petition under Welfare and Institutions Code section 300, subdivisions (a), (b) and (j),[1] adjudicating five girls dependents of the court and removing them from their parents' physical custody. Following Mother's appeal, the children were returned home and jurisdiction over all but one of them was terminated. Appellant Jennifer W. (Mother) contends that substantial evidence did not support the juvenile court's jurisdiction and disposition findings and that procedural and evidentiary errors infected the dependency process. We affirm. The orders entered following Mother's appeal have rendered many of her contentions moot. With respect to her remaining arguments, substantial evidence supported the jurisdiction findings and Mother was not prejudiced by any of the juvenile court's rulings.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Facts Leading to the Section 300 Petition.*

Mother and Father are second generation Chinese Americans who have five daughters. They came to the attention of the Los Angeles County Department of Children and Family Services (Department) on June 8, 2012. The Department received a referral that the oldest daughter, 11-year-old Hannah, was crying, saying she did not want to go home. The caller reported observing bruising on Hannah's arms; Hannah said Father caused the bruising on her left arm and her younger sisters caused the bruising on her right arm. According to the referral, Father uses corporal punishment on Hannah as a form of discipline, including hitting her on the head, and the arm bruises occurred when Father hit her over some "money issues." The caller had no information as to whether Hannah's sisters were disciplined in a similar manner.

On the same day, a social worker interviewed Hannah as well as three of her sisters—Leah (age 10), Kiana (age 8) and Kayla (age 6). The social worker observed two quarter-sized bruises on Hannah's left arm and three scratches on her right forearm. Hannah reported that the bruises resulted from Father hitting her with his closed fist in

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

front of her sisters, who were too scared to tell him to stop. She said the scratches were from her sisters. She stated she was afraid of Father and he hit her once or twice per month; he hit her sisters less frequently. She added that Mother was aware of Father's conduct, but was at work when the most recent incident occurred. When asked why Father was mad at her, Hannah cried but would not answer.

Leah reported that when she and her sisters got into trouble their parents would make them stand in a corner or hit them. Leah stated that Father hits Hannah when she gets into trouble, but she could not remember if Hannah was in trouble the preceding day. She denied hitting Hannah. She added that Mother hits her on the arm, sometimes with an open hand and sometimes with a closed hand. Kiana reported hearing Father and Hannah argue, added a comment about Hannah taking some money and denied that her parents ever hit her. Kayla reported that both Mother and Father hit the girls, and the day before Father had told Leah to hit Hannah. She stated that Hannah gets in trouble the most and that Leah now has Hannah's room. She thought Hannah stole $200 from Father. All three girls said they felt safe at home with Mother and Father.

The school principal reported that all girls do well in school and do not have behavioral problems. She observed that Father is often agitated, most recently about Hannah's stealing money from him. School staff confirmed that Hannah recently brought at least $100 to school.

The social worker also interviewed Father, who noticed money missing from his wallet and later learned that Hannah brought the money to school with her and gave it to another student. He said he wanted to hit her but did not. He admitted to slapping Hannah lightly in the past and stated he lectures and yells as means of discipline. Mother identified Father as the girls' primary caretaker. She said he typically disciplined them by yelling, making them stand in a corner and slapping them on the bottom. Though Mother was aware of Hannah stealing money, she was unaware of the incident between Hannah and Father that led to the referral. She stated she did not know what to believe. On the one hand, she thought Father had an anger problem and scared the children when he yelled, but on the other hand she thought Hannah lied and stole for attention.

3

The referral also contacted law enforcement, and the police officer who wrote the crime report said that Father appeared to have anger issues. Hannah told the officer that one bruise was from Father's hitting her, she was uncertain how the other bruise was caused and she scratched herself. Leah confirmed that Father had hit Hannah on her arm with a closed fist. Mother told the officer that she disciplines the girls by yelling, making them stand in a corner or hitting their hands or bottoms with an open hand—never a closed fist. She would use the latter two forms of discipline only when the girls would lie or steal. She added that during the last two years Hannah had been lying and stealing; she would take office supplies from Mother and give them to her friends at school. Father told the officer that he became angry after he learned that Hannah had taken $200 from his wallet and given some of the money to a friend at school and spent some of it on souvenirs during a school field trip. When confronted with this account, Hannah admitted taking the money. The officer characterized Hannah as a "drama queen," but reported that it did appear Father had hit her with a fist on her left arm.

Also on June 8, 2012, Hannah underwent a "Suspected Child Physical Abuse and Neglect Examination." The examining nurse practitioner described Hannah as anxious, nervous and appearing truthful. Hannah stated that only Father hits her but she was afraid of both Mother and Father. At this point, Father admitted to hitting Hannah two days earlier with an open hand. He further admitted to generally slapping her arms, shoulders and back of the head, as well as calling her an "'idiot.'" He said "'it's not like I beat her or anything. It's not a big deal.'" Mother agreed that Father was using an appropriate form of punishment, noting that Hannah has behavioral problems that are difficult to control. The nurse practitioner noted that Hannah's physical condition was consistent with both Hannah's and her parents' statements. During a mental health screening completed the same day, Hannah similarly reported that Father had hit her, and Mother and Father reported that Hannah had consistently exhibited defiant, disrespectful and aggressive behavior.

Mother and Father signed a safety plan, agreeing to have Father leave the home pending a team decision meeting (TDM). At the meeting, which was held on June 13,

4

2012, Mother and Father agreed to a voluntary family maintenance plan (VFM plan) involving family preservation services for the family, counseling for Hannah and a parenting class for Mother and Father.

Kiana, Kayla, and Alyssa (age 4) underwent suspected child abuse examinations on June 14, 2012. Both Kiana and Kayla reported Father had punched them on the arms and back when he was upset, and both said "mom hits us but not me with the belt on arms and back." Alyssa was too young to make a statement.

The Department asserted that by mid-August 2012 Mother and Father still had not signed the VFM plan; nor had they enrolled Hannah in counseling or begun a parenting class. Moreover, they declined to allow the Department to meet with their children during unannounced visits and would consent to meetings only if scheduled in advance, recorded and attended by a family member or attorney. At that point, the Department recommended that the children be placed under juvenile court supervision because it was unable to ascertain whether the parents had stopped using physical discipline, and Mother and Father had demonstrated a lack of parenting skills and anger management.

***Section 300 Petition.***

On August 20, 2012, the Department filed a "non-detained" section 300 petition containing allegations under subdivisions (a), (b) and (j). Under section 300, subdivision (a), the petition alleged that Father had physically abused Hannah (paragraph a-1), Kayla (paragraph a-2) and Leah (paragraph a-4) by striking them with his fists; that Mother had physically abused Kayla (paragraph a-3) and Leah (paragraph a-5) by striking them with her fists; and that each parent knew of the other's abuse. These allegations were repeated under paragraphs b-1 through b-5, and the petition added under paragraph b-6 that Father placed the children at risk by directing Leah to strike Hannah. The allegations under section 300, subdivision (b) also formed the basis for the allegations under section 300, subdivision (j). The Department recommended that the children remain placed at home with their parents.

At the hearing on the petition, the juvenile court immediately questioned the home-of-parents recommendation, and Mother and Father submitted their signed

5

VFM plan. Counsel for the children concurred with the home-of-parent recommendation, noting that the girls reported they feel safe at home with Mother and Father. Counsel further stated that her conversations with the girls were not consistent with Kiana's statement in the Department's report that Father hit all of them or with Kayla's prior statement that Mother used a belt on them. Nonetheless, the juvenile court found Mother and Father "resistant" to the Department's case plan; it ordered the children removed from the parents' custody. Mother and Father received monitored visitation and Hannah was directed to be enrolled in counseling. At the request of the children's counsel, the juvenile court also ordered Mother and Father not to videotape the children's interviews with the Department.

### *Jurisdiction and Disposition.*

Shortly after the detention hearing, all children were released to their maternal grandmother (MGM). Mother, Father, MGM, another relative and the Department staff participated in another TDM on September 13, 2012. Mother and Father expressed concern about Hannah's behavior, and stated that their attempts to use the techniques they had learned in parenting class were thwarted by their extended family's permissive behavior toward the children. Extended family members, however, stated that Mother and Father treated the children unequally and lacked insight as to how their behavior resulted in Hannah feeling unloved and unprotected. The group explored the possibility of having Hannah remain with MGM and the other girls return home, but that option was rejected to prevent Hannah from being labeled as the "'scapegoat.'" They determined that all children should remain with MGM to allow more time for Mother and Father to receive counseling and services.

At a September 18, 2012 hearing addressing the results of the TDM, the juvenile court described the reason for the four younger children not being returned home, and the children's counsel stated she was "not comfortable." The juvenile court stated it was an "interesting issue" whether counsel had a conflict representing all five children and that it would be addressed at the upcoming jurisdiction hearing.

6

The Department re-interviewed all children for the jurisdiction/disposition report, and in private conversations with the social worker each girl gave a completely different account of the incidents leading to detention. Hannah stated that Father hit her on June 8, 2012, but could not recall whether it was with an open hand or fist. She said that Father told Leah to hit her once or twice and that she could not recall any other incidents where Father hit her. She said the petition's allegations of physical abuse involving Leah and Kayla were untrue and never happened. She added that she was used to being at MGM's house by herself, and that "'[r]ight now with all my sisters here, it's killing me.'" Leah stated that Father hit her once with an open hand. She was uncertain about what had happened on June 8, 2012, but knew that Father did not ask her to hit Hannah that day. She said the allegations concerning abuse of Kayla and her were untrue. She added "'I'm not scared of my parents. I want to go home.'" Kiana stated that Mother did not hit any of them, she never saw Father hit Hannah or Kayla, and Father did not tell Leah to hit Hannah. She, too, wanted to go home. Kayla stated that neither Mother nor Father hit her sisters and they were only made to stand in the corner. Alyssa stated her parents did not hit her and she had never seen her sisters being hit.

The Department also interviewed Mother who stated that Hannah's behavioral problems started in second grade, and that she has lied and stolen money and other items from the home. Regarding the June 8, 2012 incident, Father discovered $200 missing from his wallet and called Mother to make sure she had not taken it. Mother received a call from the school that Hannah and her friend had been showing off $100 dollar bills. Father brought Hannah home; he yelled at her and discovered she had purchased souvenirs from her field trip. He called MGM to come get Hannah. Leah reported to Mother that Kayla and Kiana had hit Hannah. Later the same day, Hannah admitted to Mother stealing the money and buying souvenirs with it. More recently, Hannah told Mother "'you guys cannot touch me or I just call the police.'" Mother stated that Father had used an open hand to slap Hannah's arm, that she never hit the children and that she and Father were trying to cooperate with the Department.

7

Father denied ever hitting the children with a closed fist or telling Leah to hit Hannah. He and Mother had hit them with an open hand on their bottom. He admitted to being angry and resentful about the accusations against him, but stated he was willing to do anything to have his children returned home. Both Mother and Father had been successfully participating in parenting classes.

The MGM had not seen the parents hit the children, nor had she seen any evidence that they had been hit. She often watched the children and was aware that Hannah could be rebellious. The maternal grandfather concurred. A maternal aunt had never seen the parents hit the children but said that the parents treat Leah as the "queen" and Hannah as the "cast-off," and they therefore may have looked the other way if Leah hit Hannah.

The Department advocated that the petition be sustained as pled on the basis of the children's statements during their initial interviews. At the September 24, 2012 jurisdiction/disposition hearing, the juvenile court received the Department's reports into evidence. Angela Chau, the Department investigator who prepared the jurisdiction/disposition report, testified about the Department's recommendations. Her current information about the present risk to the children involved an incident told to her by the social worker, who heard about it from MGM. During a visit where the parents were helping Alyssa with her homework, the Mother had trouble controlling her temper, the Father stepped in, and both parents then left the room. Chau had not followed up on the incident with anyone. Chau then stated the Department's concern about returning all children except Hannah home was that "[w]e basically feel that all children should be together," and the Department wanted to insure that the parents were addressing their anger management issues and understanding their family dynamic. She thought the parents had not yet had enough time to address the issues that brought them to court. She later emphasized that the Department saw the children "as a group instead of singling them out."

Chau opined the petition's allegations of physical abuse were true on the basis of the children's original statements to the emergency response worker. She did not address with the children why their later statements were contradictory, stating "they all tend to

8

minimize everything because they all want to go home." With respect to the question of going home, Chau testified that the children except Hannah could be returned home safely on the condition the parents complied with their case plan. She added that it would be "best" if Mother and Father were given longer to comply and that she did not like leaving Hannah alone in her placement. In response to the question "Could the children safely be returned home to the parents today if the parents comply with the case plan from here on out," Chau responded "I don't know."

Through Chau's testimony, it became apparent that the Department had no evidence to support the allegation that Mother was aware of Father's physical abuse. The juvenile court granted Mother's motion to strike the allegations relating to her knowledge of Father's abuse and failure to protect.

Mother called Kayla to testify. After inquiring, the juvenile court found she was not qualified, as she was unable to articulate the difference between the truth and a lie. The juvenile court did, however, allow her prior statements into evidence, finding they were inherently reliable when made. Leah testified that Mother and Father disciplined her by making her stand in a corner. She did not remember telling a social worker that Mother and Father hit her. The record indicated that Leah paused for a long time before responding "no" to the question whether Mother had ever hit her with an open hand. She said the most important thing for her was to go home.

Hannah also testified, stating that sometimes Father yelled at her or hit her with an open hand when he was angry. She did not remember the incident when she took money from Father's wallet, and could not remember the last time Father had hit her. She was afraid to go home, fearing that Father would "[g]et mad and put all his anger out on me." She said Kayla once told her that Father hit her. Nonetheless, she thought her sisters would be safe if they went home.

With the exception of the allegations that were stricken earlier in the hearing, the juvenile court found the section 300 petition true as pled. The juvenile court heard argument regarding disposition. The Department advocated for continued placement with MGM, while Mother and Father supported the return of all children but Hannah.

9

Counsel for the children supported continued placement with MGM for all children, asserting that all children were sufficiently similarly situated and Hannah should not be ostracized from her family. Noting that it considered Leah's recanting her earlier statements and Hannah's expression of fear, the juvenile court ordered the children to remain suitably placed with MGM, finding by clear and convincing evidence that returning the children to their parent's home created substantial danger to their health, safety, protection or physical or emotional well being. Mother and Father received reunification services including monitored visitation, parenting education and anger management programs, and individual counseling. Hannah was to continue in individual counseling.

### *Appeal and Subsequent Hearings.*

Mother appealed. Thereafter, on January 9, 2013, the juvenile court granted a section 388 petition and ordered the children placed at home with their parents.[2] At an April 25, 2013 review hearing, the juvenile court terminated jurisdiction over all children except Hannah, finding that Mother and Father had complied with their case plan and resolved the issues that had brought them to the attention of the juvenile court. The report for the next hearing was to address terminating jurisdiction over Hannah. But in August 2013, the Department filed a supplemental petition pursuant to section 387 by which Hannah was detained with MGM at Mother's and Father's request. According to the Department's report, Hannah had been hospitalized five times since April 2013 and, despite being prescribed psychotropic medication, suffered from out-of-control moods and behavior that Mother and Father felt ill-equipped to handle.

### DISCUSSION

Mother raises several challenges to the juvenile court's jurisdiction and disposition orders. She argues that substantial evidence did not support the jurisdiction and

---

[2]    We granted the Department's requests to take judicial notice of the minute orders that were issued after the notice of appeal was filed. (E.g., *In re Adrianna P.* (2008) 166 Cal.App.4th 44, 52–53, fn. 3 [taking judicial notice of relevant juvenile court proceedings following a notice of appeal].)

10

disposition findings. She further argues the Department's investigation process was insufficiently transparent and lacked objectivity; the juvenile court abused its discretion by admitting Kayla's prior statements after finding her not qualified to testify; and the juvenile court erred in failing to appoint separate counsel for Hannah. At this stage, we cannot conclude there is any basis to disturb the juvenile court's orders.

## I. Mother's Challenges Concerning Jurisdiction Over Leah, Kiana, Kayla and Alyssa and Disposition are Moot.

Since Mother filed her notice of appeal, the juvenile court ordered all children placed at home with Mother and Father, and terminated jurisdiction over all children except Hannah. An appellate court's jurisdiction extends only to actual controversies for which the court can grant effective relief. (*In re Christina A.* (2001) 91 Cal.App.4th 1153, 1158; *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315–1316.) If subsequent acts or events have rendered the questions raised in the appeal moot, then the action no longer presents a justiciable controversy. (*In re Christina A., supra,* at p. 1158.) An example of a subsequent order that may render an appeal moot is an order terminating jurisdiction in a dependency proceeding. (See *In re C.C.* (2009) 172 Cal.App.4th 1481, 1488; *In re Michelle M.* (1992) 8 Cal.App.4th 326, 330; see also *In re Randy R.* (1977) 67 Cal.App.3d 41, 44 [appellate issue relating to disposition in juvenile delinquency matter rendered moot by termination of jurisdiction].) "The question of mootness in a dependency case should be decided on a case-by-case basis, particularly when an error in the juvenile court's initial jurisdictional finding has been alleged. [Citations.]" (*In re Dani R.* (2001) 89 Cal.App.4th 402, 404–405.)

Because the juvenile court terminated jurisdiction over four children and, prior to the section 387 petition that is not part of this appeal, returned all five of them home, our addressing issues relating to the jurisdiction over all children but Hannah and disposition

11

findings as to all children would have neither legal nor practical consequences.**3** (See *In re I.A.* (2011) 201 Cal.App.4th 1484, 1493.) There is no effective relief this court could grant Mother that has not already been granted by the juvenile court. (*In re Jessica K., supra,* 79 Cal.App.4th at p. 1315 ["When no effective relief can be granted, an appeal is moot and will be dismissed"].) Nor do we agree with Mother that there is a significant issue of public interest or continuing interest warranting our consideration of the issues resolved by the later orders. Mother's challenges are premised on the specific facts of this case. (Cf. *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404 ["a reviewing court may exercise its inherent discretion to resolve an issue rendered moot by subsequent events if the question to be decided is of continuing public importance and is a question capable of repetition, yet evading review"].) Accordingly, we find that the issues raised by Mother on appeal other than jurisdiction over Hannah have been rendered moot.

## II.  Substantial Evidence Supported the Juvenile Court's Exercise of Jurisdiction Over Hannah.

"Section 300 . . . establishes several bases for dependency jurisdiction, any one of which is sufficient to establish jurisdiction." (*In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045.) Where substantial evidence supports one basis for jurisdiction, we need not consider the sufficiency of evidence to support any other basis. (*Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875–876.)

The juvenile court assumed jurisdiction over Hannah under section 300, subdivisions (a), (b) and (j). In pertinent part, paragraphs a-1, b-1 and j-1 alleged Father "physically abused the child, Hannah, by striking the child's arm with the father's fists, inflicting bruising to the child's arm. On prior occasions, the father struck the child's head, shoulders and arms with the father's fists. Such physical abuse was excessive and caused the child unreasonable pain and suffering. The child is afraid of the father and

---

**3**     To the extent that the juvenile court's jurisdiction findings may affect Mother and Father in the future, we address Mother's arguments in connection with the findings as to Hannah in parts II and III, *post.* (See *In re J.K.* (2009) 174 Cal.App.4th 1426, 1432.)

12

does not wish to return to the father's home and care due to the father's physical abuse of the child. The mother . . . allowed the father to reside in the child's home and have unlimited access to the child. The physical abuse of the child by the father and the mother's failure to protect the child endangers the child's physical health and safety . . . ."

Conceding that the evidence supporting the juvenile court's jurisdiction over Hannah may have been "stronger" than that supporting jurisdiction over her sisters, Mother nonetheless argues Hannah suffered no more than "indignities" that did not rise to the level of harm required under the statute. We disagree. Section 300, subdivision (b) provides in relevant part that a child is within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . ." We uphold the juvenile court's findings if based on substantial evidence. (*In re James C.* (2002) 104 Cal.App.4th 470, 482.) We generally only look to the evidence supporting the successful party and disregard any contrary showing. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

Here, the evidence showed that in her initial interview with the social worker, Hannah said Father hit her with a closed fist and told her not to tell anyone. She said he had hit her on other occasions and she was fearful of him. The results of her physical examination were consistent with being hit with a fist, and law enforcement's investigation also concluded Hannah had been hit with a fist. For the jurisdiction/disposition report, she repeated that Father hit her, causing bruises. Though Hannah testified at the jurisdiction hearing she could not remember the incident described in the petition, she said that Father had hit her in the past and she feared he would continue to take his anger out on her. Mother knew that Father had an anger problem that scared the children. Though Father denied hitting Hannah with his fist, he thought it was "not a big deal" to have hit her with an open hand and called her an idiot.

13

At a minimum, this evidence was sufficient to support jurisdiction under section 300, subdivision (b).  (See *In re Mariah T.* (2008) 159 Cal.App.4th 428, 438–439 [where a mother had struck two children with a belt as a means of discipline, and denied and minimized her actions in an effort to justify them as legitimate punishment, court could conclude children remained at risk].)  Though Mother highlights the lack of severity of Hannah's injuries, the Legislature's goal in enacting section 300 was to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm."  (§ 300.2.)  Thus, the juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.  (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194–195.)  The focus of section 300 is on averting harm to the child.  (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.)  Here, the evidence showed that Hannah remained at risk from Father's conduct.  (See *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 ["[A] jurisdictional finding good against one parent is good against both.  More accurately, the minor is a dependent if the actions of either parent bring her within one of the statutory definitions of a dependent"].)

### III.    Procedural Errors Did Not Affect the Jurisdictional Findings.

Beyond challenging the sufficiency of the evidence to support the jurisdictional findings, Mother contends that three separate procedural errors require reversal of the jurisdiction order.  First, Mother creates an argument concerning the "transparency" of the process, asserting the Department undermined the reliability of the dependency proceedings and violated Mother's due process rights by failing to reconcile or explore discrepancies in the children's statements and by directing the parents not to record the children's statements.  "[I]n dependency proceedings, a parent's right to due process is limited by the need to balance the 'interest in regaining custody of the minors against the state's desire to conclude dependency matters expeditiously and . . . exercise broad control over the proceedings . . . .' [Citation.]"  (*In re Nada P.* (2001) 89 Cal.App.4th 1166, 1176.)  Moreover, "[t]he due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court.  [Citations.]"  (*In re*

*Jeanette V.* (1998) 68 Cal.App.4th 811, 817.) The reviewing court will not disturb the juvenile court's rulings in this regard "absent an "'"'"'"arbitrary, capricious, or patently absurd determination. . . .'"'"'"'" [Citation.]" (*In re Nada P., supra,* at p. 1176.)

We find nothing arbitrary or capricious in connection with the juvenile court's procedural rulings. By the time the section 300 petition was filed, the children had already made a number of inconsistent statements concerning how their parents disciplined them. At the detention hearing, the children's counsel asked for an order that the Mother and Father not videotape the children's interviews. In granting the order, the juvenile court reasonably could have concluded that recording the children was not conducive to their providing truthful statements. (Cf. § 350, subd. (b)(2)-(3) [permitting child to testify in chambers where "[t]he minor is likely to be intimidated by a formal courtroom setting" or "[t]he minor is afraid to testify in front of his or her parent or parents"].) Nor do we find that Mother's due process rights were violated by the Department's failing to gather additional evidence concerning the children's more recent statements. On the basis of her observations of the children, the juvenile court properly permitted Chau to testify that the children tended to minimize previous events because of their desire to return home. (Evid. Code, § 702.) The juvenile court admitted into evidence and considered all conflicting statements in making its jurisdictional findings. Despite any claimed deficiencies in the Department's investigation, the juvenile court had the exclusive role of assessing the Department's reports and the credibility of witnesses, and we may not reweigh the evidence under the guise of evaluating the transparency of the proceedings. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564; *In re Casey D.* (1999) 70 Cal.App.4th 38, 52.)

Second, Mother contends the juvenile court abused its discretion in disallowing Kayla's testimony while simultaneously allowing into evidence her prior out-of-court statements. The juvenile determined that Kayla was not qualified to testify because she could not understand the difference between the truth and a lie. (See Evid. Code, § 701, subd. (a)(2).) In *In re Cindy L.* (1997) 17 Cal.4th 15, 34, the Court held "that a finding of incompetence to testify should not be a categorical bar to the admission of a child's out-

15

of-court statements" and determined that the spontaneity of the statement, "the lack of motive to lie, and other factors . . . [may] lead to the conclusion that the statement bears special indicia of reliability and is therefore admissible." The juvenile court determined that Kayla's out-of-court statements during her initial interview were sufficiently reliable to be admissible.

We need not address Mother's arguments concerning the lack of reliability of those statements because Mother has failed to demonstrate how she was prejudiced by their admission. A judgment or order will be reversed for the erroneous admission of evidence only where the "error or errors complained of resulted in a miscarriage of justice," meaning it is reasonably probable a different result would have occurred in the absence of the purported error. (Evid. Code, § 353, subd. (b); *In re Celine R.* (2003) 31 Cal.4th 45, 59–60.) Prejudice is not presumed; it must be affirmatively shown. (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624.) In view of the other evidence supporting jurisdiction over Hannah—including Hannah's statements, her physical condition and statements by the children other than Kayla—we cannot conclude it is reasonably probable a different outcome would have occurred if the juvenile court had not considered Kayla's out-of-court statements.

Finally, Mother contends the juvenile court erred in failing to appoint separate counsel for Hannah. (See *In re Candida S.* (1992) 7 Cal.App.4th 1240, 1252 [parent has standing to raise issue of separate counsel for the parent's dependent children because "independent representation of the children's interests impacts upon the parent's interest in the parent-child relationship"].) The Court in *In re Celine R., supra,* 31 Cal.4th 45 addressed the issue of separate counsel for multiple children, explaining "that the court may appoint a single attorney to represent all of the siblings unless, at the time of appointment, an actual conflict of interest exists among them or it appears from circumstances specific to the case that it is reasonably likely an actual conflict will arise. After the initial appointment, the court must relieve counsel from the joint representation when, but only when, an actual conflict of interest rises." (*Id*. at p. 50.) Any "error in not appointing separate counsel for a child or relieving conflicted counsel" requires reversal

16

only if it is reasonably probable the outcome would have been different but for the error. (*Id*. at pp. 59, 60.)

We need not reach the fundamental question raised by Mother, as her arguments concerning the conflict of interest among the children are all directed toward their placement. She argues that the evidence showed all children but Hannah could have been returned home safely at the time of disposition, and thus counsel had an actual conflict of interest. (Cf. *Carroll v. Superior Court* (2002) 101 Cal.App.4th 1423, 1428 [actual conflict of interest arises where one child seeks to maintain a sibling relationship and another child seeks a placement that will disrupt that relationship].) Regardless of the merits of Mother's position, we have already concluded that the subsequent order placing all children at home with Mother and Father has rendered moot any challenge to the disposition order. At this point, our resolution of the issue whether the children should have had separate counsel would have no practical impact on Mother or the children and would not result in the grant of any effective relief. (E.g., *In re I.A., supra*, 201 Cal.App.4th at pp. 1490–1491.) We therefore decline to address the issue as moot.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

                                        _____, J. *
                                                FERNS

We concur:


_____, P. J.
        BOREN


_____, J.
        CHAVEZ

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18