Filed 6/14/16  In re A.M. CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (San Joaquin)

----

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | C078846 |
| | (Super. Ct. No. J06261) |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | |
| v. | |
| A.C., | |
| Defendant and Appellant. | |
| In re D.C., a Person Coming Under the Juvenile Court Law. | C080024 |
| | (Super. Ct. No. J06261) |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | |
| v. | |
| A.C., | |
| Defendant and Appellant. | |

1

A.C. (mother) appeals from the March 12, 2015, August 6, 2015, and September 17, 2015 orders of the juvenile court regarding visitation with the minors A.M. and D.C. She contends: (1) the juvenile court abused its discretion by making the orders without making a finding of detriment, and the orders are not supported by substantial evidence of a change in circumstances or that suspension of visitation was in the best interests of the minors; (2) her counsel was prejudicially ineffective for failing to request a continuance of the March 12, 2015 hearing or object to improper notice; and (3) minors' counsel had an unavoidable conflict of interest in representing both A.M. and D.C.

We will affirm all three visitation orders as to A.M. We will affirm the March 12, 2015 order as to D.C., but remand the August 6, 2015 and September 17, 2015 orders as to D.C. for further proceedings regarding visitation with D.C.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 24, 2013, D.C. (then 12 years old) walked into the Lodi Police Department and informed officers that mother had slapped her several times in the face. D.C. refused to return home and said mother often hit her. Officers' attempts to contact mother were unsuccessful and D.C. was taken to a children's shelter.

When mother was eventually contacted, she told officers she hit D.C. on the leg "and maybe in the mouth" after D.C. struck her sibling, A.M. (then seven years old), during an argument. A.M. later told authorities that mother and D.C. fight "a lot" and hit each other. Mother admitted she has "anger issues and may be a little bipolar" and she smokes marijuana outside the presence of the children. Mother was offered in-home services to help keep D.C. in the home. She declined, stating she did not want people checking up on her.

2

On March 27, 2013, the San Joaquin County Human Services Agency (Agency) filed a dependency petition alleging the minors came within Welfare and Institutions Code[1] section 300, subdivisions (b), (g), and (j) for a number of reasons, including the reported current physical assault on D.C., past assaults by mother, past harm to the minors' sibling M.C. inflicted by the father of D.C., and lack of provision for support due to the unknown whereabouts of the minors' fathers.[2]

At the March 29, 2013 detention hearing, the juvenile court ordered D.C. detained and placed temporarily in the care of the Agency, and continued the matter as to the other minors. The court also ordered mother to allow D.C. to remove her personal items from a storage facility but not to speak to D.C. during that process.

Mother was not present at the April 29, 2013 hearing. The Agency informed the court that mother went to D.C.'s school and, when D.C. asked about her Nintendo DSI, mother "called the minor a bitch and told her that she sold the DSI." This greatly upset D.C. The court issued an order to show cause for contempt regarding mother's failure to abide by the court's order to turn over personal items to D.C.

On May 13, 2013, the juvenile court sustained the allegations in the section 300 petition.

At the June 4, 2013 hearing, the juvenile court ordered mother drug tested based on her outbursts in court and the social worker's opinion that mother might be under the influence of drugs. Mother refused. The court ordered A.M. and M.C. detained.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The original petition included a third sibling, M.C. (then 16 years old), not living in mother's home at the time. However, M.C. eventually transitioned out of dependency due to his age, as reflected in later amended versions of the petition. M.C. is not a party to this appeal and will not be discussed unless relevant to the issues at hand.

On June 28, 2013, the juvenile court ordered reunification services provided to mother as outlined in the case plan. The court also ordered supervised visitation between mother and A.M.

At the July 25, 2013 hearing, the Agency reported the social worker was no longer willing to supervise visits between mother and A.M. due to mother's behavior during the visits, including smoking, being argumentative, not following directions, allowing A.M. to run all over the parking lot, and bringing other people to the visits. In addition, mother unilaterally enrolled A.M. in a nearby school and told the minor she would be "coming to school every day" and "seeing him every day," causing the minor to experience conflicting emotions. The juvenile court continued visitation with the minors and issued a restraining order prohibiting mother from going to the minors' schools.

At the August 15, 2013 hearing, the court clarified that visitation would be permitted in two one-hour visits per week.

On August 22, 2013, the drug court case manager informed the juvenile court that mother made her drug court assessment "very difficult" and recommended mother "not be in residential but [an] intensive out-patient program." The court was further informed that mother was refusing to do a drug treatment program, stated she does not have a problem, and refused to sign releases of information. The court admonished mother that it was "thinking right now of terminating [mother] from drug court" and that in order to reunify with the minors, mother would have to complete drug court. Mother said, "I don't want that attorney no more. I need a new attorney."

On August 27, 2013, the juvenile court held a *Marsden*[3] hearing at mother's request. At the conclusion of the hearing, the court denied the motion. Thereafter, the Agency informed the court as follows: "[A]t the mother's last visit we had to call the

---

[3] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

4

sheriff's department out because the mother made a big scene. She wouldn't let the minor go. We had to call the sheriff out. So we don't want to reduce the mother's visits but we cannot have this kind of behavior. You admonished her about her behavior before. And additionally, the minor [A.M.] disclosed to [the social worker] that the mother is telling him to act out in foster care so he can go home and that's not appropriate. So we're asking her not to talk about the case, to try to behave herself accordingly because the minor does enjoy visiting with [her]. But we can't have the sheriff continuing out to the visitation center." Mother's counsel argued that mother's version of events differed but admitted mother had not complied with the visitation center guidelines. The court admonished mother and the Agency not to discuss the case with A.M.

On September 19, 2013, the juvenile court entered an order directing mother to participate in drug court. Mother became disruptive.

Mother did not appear at the December 19, 2013 review and placement hearing as ordered. The court ordered that visitation with the minors no longer take place at mother's home.

According to the January 2, 2014 status review report, regularly supervised visitation between mother and A.M. was going well. The visits were supervised "because the mother has had a difficult time complying with visitation rules, like not discussing the case with her children and telling [A.M.] that he will be home soon, and blaming [D.C.] and the Agency for the minors being detained." D.C. only participated in one visit with mother. There had been only one visit between D.C. and A.M., during which the minors argued and D.C. stated she did not want to visit either A.M. or mother. The report noted that, while mother's visits with A.M. were consistent, they were "not without chaos and drama," which resulted in termination of two visits due to mother's "erratic behavior." For instance, mother became upset when she was told she was not allowed to have food

5

in the visitation area. Mother continued to scream at staff and could not be calmed down and the visit was terminated. Another visit was terminated after mother became outraged when her boyfriend, who did not have any identification, was not allowed to participate in the visit. Mother told the social worker, " 'Fuck you,' " and her behavior continued to escalate, requiring staff to summon law enforcement and terminate the visit. The report further noted the difficulty in engaging with mother due to mother's conduct, her uncontrollable bouts of anger, and her refusal to accept responsibility for her past and present behavior.

The report also noted that mother had made very little progress in her case plan since removal of the minors. Although she was sporadically attending counseling, she was terminated from drug court for refusing to participate, and was dropped from parenting class due to several unexcused absences. As of the date of the report (Jan. 2, 2014), mother had failed to attend her scheduled psychological examination with Gary Cavanaugh, M.D. The report recommended that mother be given six additional months of reunification services, and that she complete her psychological evaluation and participate in any services recommended by Dr. Cavanaugh.

Mother did not appear at the January 23, 2014 contested hearing. Finding proper notice was given, the juvenile court found by clear and convincing evidence that return of the minors to mother would create a substantial risk of detriment to the minors and placement was appropriate and necessary for their safety. The court continued the minors as dependent children of the juvenile court and incorporated the other recommendations of the social worker.

On March 6, 2014, mother made a second *Marsden* motion. The juvenile court held a hearing and denied the motion. The social worker informed the court that mother had been terminated from drug court as of October 1, 2013, stating mother's efforts had been "minimal" and interactions with mother had been difficult because she refused to

6

drug test and called the social worker using foul language and demanding a court date. Mother denied having a drug problem or knowing about the court date. The court reiterated to mother that she would need to complete drug court in order to reunify with the minors. At the request of minors' counsel, the court admonished mother not to call counsel's office, not to coax the minors to write letters, and not to speak to the minors about the case.

According to the status review report filed on May 14, 2014, mother's behavior continued to be a problem. She was "minimally compliant" with her case plan. Since being terminated from drug court, mother still had not participated in any type of drug treatment program. Although biweekly visitation between mother and the minors at a new location was reportedly going well and D.C. and A.M. were reportedly interacting better with each other, mother violated court orders by having unauthorized and unsupervised contact with the minors. For instance, M.C.'s foster parent learned that, after dropping M.C. off at a friend's house in Lodi, M.C. and mother had unauthorized contact. When M.C. fainted at a fast food restaurant, mother notified the foster parent and took M.C. to the hospital and signed the discharge paperwork. The diagnosis indicated M.C. "was dehydrated, had not eaten all day and tested positive for marijuana." A.M. "had tearful episodes after visitation" requiring his foster mom, who felt A.M. was regressing, "to spend time de-escalating him." D.C. refused to go to school and left her foster placement to stay with mother on an unauthorized weekend visit. Mother allowed D.C. to stay "instead of providing the appropriate parental reaction and insisting that [D.C.] return to the foster home."

The report also stated that, despite her progress, mother "remains in denial regarding her situation, is unable to engage in a conversation with the [social worker] regarding her case plan without becoming angry and raising her voice, as well as, blaming, cussing and being uncooperative. [Mother] does not appear to understand that

7

her refusal to participate in a psychological evaluation, parenting classes, cooperating with the [Agency] and substance abuse treatment will result in termination of her reunification services."

Additionally, the report stated mother had been arrested for failure to appear for a charge of petty theft and burglary. She contacted A.M. and informed him she was in jail and would not attend their weekly visit, causing A.M. to become very upset, cry, and act aggressively with other children in the foster home. Mother was released from jail two days later and again contacted A.M., instructing him to ask his foster parents to bring him for an unauthorized visit. This upset A.M., who cried and became frustrated and argumentative, demanding to see mother. The report further stated: "[Mother] is unable to demonstrate an understanding that her actions negatively impact her children and promotes [*sic*] feelings of conflict regarding their desire to feel stable in their placement and their allegiance to their mother. When asked about this behavior, [mother] is not remorseful and states that her children want to come home and believes that if her children continue to state this fact, the court will just allow them to return to her care." The report recommended that, because additional reunification services would not be in the minors' best interest, mother continues to lack insight regarding her situation, and mother "has not demonstrated that she intends to be compliant with her case plan and court orders," reunification services be terminated, and the minors placed in long-term foster care.

The maternal grandmother was approved by the Interstate Compact on Placement of Children (ICPC) for placement of the minors in her home in Idaho. On June 5, 2014, the juvenile court authorized ICPC placement of the minors with the maternal grandmother.

At the July 1, 2014 contested dependent review hearing, mother testified regarding her progress in her case plan, including her efforts in counseling and parenting classes.

8

She denied knowing she was supposed to attend dependency drug court, or that she was required to attend "seven meetings in a row." She admitted she smoked marijuana at night to help her sleep but not during the daytime. With regard to the requirement that she see Dr. Cavanaugh for a psychological evaluation, mother testified that she went to the appointment but refused to take a "500-question personality test." She indicated she was willing to be evaluated, but would not take the personality test. Mother further testified she was regularly visiting the minors before they went to Idaho. She confirmed she wanted the minors returned to her, stating, "My boys want to come home. My daughter wants to be with my mom. I would give guardianship to my mom. I want her happy. My boys want her to come back. I want them home, but my daughter doesn't want to come back. She doesn't want to come back. She is my only girl."

Mother admitted having had unauthorized visits with each of the minors. When asked whether she would be willing to do either outpatient or residential drug treatment in order to reunify with the minors, mother said she would be willing to do outpatient treatment, as well as parenting classes and additional counseling, but refused to participate in residential drug treatment.

On cross-examination, mother stated she felt she had learned to control her angry outbursts around the minors. When asked if she felt she was controlling her anger during her outbursts in court, mother said, "With my kids, yes. I don't have outbursts like this. With everybody else, hey, I try. [¶] . . . [¶] I don't like being lied to." When asked if she understood that the minors' witnessing her angry outbursts in court might not be beneficial to them, mother said, "Everybody has problems. Nobody is perfect. Everybody yells at their kid at some time." With regard to her failure to participate in drug court, mother again stated she was not told she had a court date and "therefore I was dropped and it was not my fault." When asked if she felt the minors were doing well in Idaho, mother said, "They just got there. They are always going to do well with my

mother. [¶] . . . [¶] They are not happy though, no." Regarding discussion with her counselor regarding her anger and yelling, mother explained: "When my, when, when someone lies on me and someone doesn't tell the truth and I get upset or you know it is hard, I try. My son was 17, though, so he knows. And my other one, they know me. I don't cuss. I am not cussing and yelling at him. I think everybody had done it in front of their kids. At some point in time everybody has. I am sure a lot of kids hit their kids. I don't discipline my kids like that." She admitted she had "a lot of anger in my life" and stated she was working on it in counseling.

The court found mother participated in counseling but did not follow through with drug court, refused to drug test, was uncooperative, made no attempt to avoid unauthorized visits, and generally was unwilling to participate in and made "minimal progress" with her case plan. The court noted mother "is not forthright," has admitted having anger issues, and is willing to follow the court's direction only when "it is what she wants." The court terminated reunification services, found by clear and convincing evidence that return of the minors would create a substantial risk of physical or emotional harm and placement was appropriate and necessary for their safety, and continued the minors as dependent children of the court. The court stated the next step would be determined by how the minors were doing in their placement in Idaho.

As mother exited the courtroom, she yelled expletives at the social worker. The court instructed mother to stop and demanded an apology. Mother accused the social worker and the court of lying. Again, the court demanded an apology and threatened to find mother in contempt. Mother said, "I apologize."

According to the November 20, 2014 status review report, the minors were still living with the maternal grandmother in Idaho. D.C. continued to "struggle with episodes of severe tantrums and mood disturbance" and, on November 13, 2014, was transported by law enforcement to a hospital in Idaho after she threatened to harm herself. A.M. was

10

adjusting to his environment and appeared to be "comfortable and relaxed" living with his grandmother. The relationship between D.C. and A.M. had improved since their relocation to Idaho. Mother had arrived in Idaho on August 19, 2014, and told Idaho social services she was living with an aunt. Mother was visiting regularly with the minors.

At the November 20, 2014 review hearing, the juvenile court found by clear and convincing evidence that return of the minors to mother would create a substantial risk of detriment, and continued the minors as dependents of the juvenile court. All prior orders, including the visitation order, remained in full force and effect.

Mother did not appear at the February 13, 2015 placement review hearing. The Agency informed the court that Idaho social services was no longer willing to supervise the minors due to a physical altercation between D.C. and the maternal grandmother, during which the grandmother allegedly hit D.C. The court was also advised that, during the course of investigating the altercation, it was discovered that mother was in fact living with the maternal grandmother and the minors, contrary to court order and mother's previous representation. The juvenile court authorized the Agency to retrieve the minors from Idaho and return them to California.

At the March 3, 2015 hearing on placement and visitation, mother's counsel denied mother was living with the maternal grandmother in Idaho and requested visitation with the minors. Counsel indicated mother had attended a parenting class and intended to complete that program. Minors' counsel objected to visitation, arguing mother had in fact been living with the minors in Idaho in direct violation of the court order, and stating the minors needed stabilization before visitation would be appropriate. The Agency also objected to visitation, arguing it was not in the minors' best interests. The Agency noted mother's admission during hearings in the Idaho court that she had been living with the maternal grandmother in Idaho. The Agency further argued D.C.

11

was refusing to go to school and should participate in therapy before visitation would be appropriate. The court temporarily denied visitation without prejudice and set the matter for review.

At the March 12, 2015 placement and visitation review hearing, the Agency informed the court that, since her return from Idaho in February, mother had been arrested once and had been visiting the minors. As a result, A.M. was "aggressive" and D.C. was "not settling down, going AWOL." The Agency objected, as did minors' counsel, to further visitation until the minors could be "stabilized" and A.M. could obtain counseling. According to minors' counsel, D.C. was not attending school. Mother's counsel requested visitation with the minors, arguing visitation with the minors in Idaho had gone well and denying any visitation between mother and the minors had occurred since mother's return from Idaho. The court temporarily suspended visitation until the next hearing date of May 14, 2015. Mother became argumentative, telling the court, "You are so wrong to do this. You are hurting my kids." "I am coming back. Filing an appeal. I am a good mom. Everything is a lie."

Mother filed a timely notice of appeal of the juvenile court's March 12, 2015 order temporarily suspending visitation with the minors. This court requested supplemental briefing discussing why the appeal should not be dismissed as moot in light of the fact that the challenged temporary period of suspension had already passed.

In the meantime, the Agency filed a May 14, 2015 status review report stating that, based on D.C.'s "current social functioning and her pattern of unpredictable tantrum behaviors," therapeutic residential programs would be explored, as recommended by Dr. Cavanaugh following his general psychiatric evaluation of D.C. In that regard, the report noted: "For the past six months, [D.C.] refused to participate in [m]ental [h]ealth therapy sessions. As [D.C.] began to decompensate, the triggering antecedents were difficult to identify. The maternal grandmother, who was responsible for providing care

12

and supervision for [D.C.], reported that the minor became increasingly agitated and angry after her 'cell phone' was removed. At the same time as [D.C.] was denied access to her cell phone, [D.C.] began to isolate herself in her bedroom. [D.C.] refused to attend her middle school classes. Anytime [D.C.] did not get her own way, she engaged in violent tantrum behaviors. [D.C.] put a hole in her bedroom wall. [D.C.] threatened to kill herself and her grandmother. [D.C.] would threaten to run away. [D.C.] seemed to want to create a family in her own image. [D.C.] announced that she wanted to have a baby. [D.C.] seems oblivious to the fact that she immolates [*sic*] her biological mother . . . . The mother . . . and her daughter, [D.C.], in fact appear to have a love-hate relationship. Unfortunately, we have not managed to gain [D.C.'s] cooperation with [m]ental [h]ealth service providers. It has presented a unique challenge for all of her primary service providers to understand [D.C.'s] defiant negative behavior responses."

The report stated A.M. seemed to be adjusting to his current home environment and his new school. The report further noted mother "seems unaware of her role in and her responsibility for the disrupted placement with her mother . . . in Idaho," and "continues to telephone the [the social worker] blaming this social worker for taking away her visits." Finally, the report noted no visitation had taken place since the minors' return to California on February 18, 2015, and indicated both minors were requesting visits with each other and mother. The Agency recommended continued planned permanent living arrangements for the minors.

The juvenile court held a review hearing on May 14, 2015 as scheduled. Mother's counsel appeared but mother did not. The court acknowledged having read and considered the status review report and admonished D.C. to participate in therapeutic counseling. Mother's counsel submitted on the report without prejudice. The court concluded mother was given proper notice of the hearing, found by clear and convincing evidence that return of the minors to mother would create substantial risk of detriment,

13

and continued the minors as dependent children of the juvenile court.  The court also incorporated the social worker's recommendations as set forth in the report, ordered all prior orders to remain in full force and effect, and set the matter for hearing on July 30, 2015.

Mother was not present at the July 30, 2015 status review hearing.  Pursuant to the request of mother's counsel, the court continued the issue of visitation with D.C. to August 6, 2015, to allow the matter to be heard by the judge who originally suspended visitation on March 12, 2015 (Hon. Anthony P. Lucaccini).

Mother attended the August 6, 2015 visitation review hearing and requested that the court withdraw the order suspending visitation with the minors.  The Agency informed the court it was concerned about possible improper communications between mother and D.C. and the risks of "destabilizing the placement," but stated it would not object to once-a-month supervised visitation with A.M. increasing in frequency so long as "it is not destabilizing" and "mother doesn't say anything inappropriate."  When the court asked D.C. if she wanted to have supervised visits or any visits with mother, D.C. indicated she only wanted visitation with her brother, A.M.

Mother's counsel informed the court that mother wanted visitation with both minors and requested more frequent visits with A.M.  The court concluded, over mother's objections and interruptions, that visitation with A.M. would "start off once a month" to "see how it goes," and indicated it had no opposition to increasing the frequency of visits at a later time or conducting those visits at mother's home.  Mother was eventually removed from the courtroom for disruptive behavior.  The court confirmed D.C. did not want visitation with mother and ordered monthly supervised visitation between mother and A.M.

On August 10, 2015, mother filed a timely notice of appeal of the juvenile court's August 6, 2015 order.

14

At the September 17, 2015 placement review hearing, the Agency, minors' counsel, D.C.'s therapist, and group home staff all reported that D.C. was progressing well in school and therapy. The court granted the Agency discretion to move D.C. from the group home to a foster home, based on D.C.'s progress.

Mother requested visitation with D.C. and increased visitation with A.M., as well as visitation between A.M. and "his father" (mother's boyfriend). Mother also expressed concern that A.M. had not been given an opportunity to address the court, and claimed she was not provided with a copy of the most recent report. The court indicated it was "not prepared to change the visitation orders at this point" and ordered visitation "remain as previously ordered." The court further stated it would allow the social worker to talk to A.M. to determine "if there is a possibility for visits with the father," but indicated the matter would require the approval of the court. Mother also complained she had not had any telephone calls with A.M. The court noted that right had previously been restricted. Mother informed the court, "I want to appeal everything. I am appealing every single court date I have. You have, so wrong, so wrong, so wrong, I didn't do nothing." "You can't take my visits like that. You can't take, detriment to my child. Conflict of interest, too." The hearing was concluded.

Mother filed a notice of appeal of the juvenile court's September 17, 2015 order.

## DISCUSSION

### 1.0    Visitation Orders

Mother challenges three of the juvenile court's orders: (1) the March 12, 2015 order temporarily suspending visitation with the minors, (2) the August 6, 2015 order granting supervised visitation with A.M. and continuing the suspended visitation with D.C., and (3) the September 17, 2015 order denying mother's request to modify visitation. Without referring specifically to any of the three orders, mother generally

15

contends the juvenile court abused its discretion by suspending visitation without making a finding of detriment, and the orders are not supported by substantial evidence of either a change in circumstance or that modification is in the best interests of the minors.

As we shall explain, mother's claims regarding the March 12, 2015 order lack merit. The August 6, 2015 and September 17, 2015 orders granted reasonable visitation with A.M. and therefore mother's claims lack merit as to A.M. However, neither the August 6, 2015 order nor the September 17, 2015 order address visitation with D.C., nor are they supported by a finding of detriment. We will therefore remand for further proceedings as to those orders.

"Visitation orders made at the time of the dispositional hearing are governed by section 362.1. Subdivision (a)(1)(A) of that section provides, 'In order to maintain ties between the parent or guardian and any siblings and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent or guardian, . . . any order placing a child in foster care, and ordering reunification services, shall provide as follows: [¶] . . . Subject to subparagraph (B), for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child.' Subdivision (a)(1)(B) provides, 'No visitation order shall jeopardize the safety of the child. . . .' " (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1489-1490; see *In re S.H.* (2003) 111 Cal.App.4th 310, 317, fn. 8.)

"It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances. [Citations.] To sustain this balance the child's social worker may be given responsibility to manage the actual details of the visits, including the power to determine the time, place and manner in which visits should occur. [Citation.] In addition, the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense; the child's

16

input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation.  [Citation.]  [¶] Nonetheless, the power to decide whether *any* visitation occurs belongs to the court alone."  (*In re S.H.*, *supra*, 111 Cal.App.4th at p. 317.)

As a general rule, the juvenile court is accorded broad discretion with regard to visitation matters.  On appeal, absent a showing of a clear abuse of discretion, the reviewing court will not interfere with the exercise of that discretion.  (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356; *In re Megan B.* (1991) 235 Cal.App.3d 942, 953.) An abuse of discretion means the juvenile court exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Here, there was a visitation order in effect prior to the March 12, 2015 hearing. However, the minors had just been returned to foster placement in California from their maternal grandmother's home in Idaho following a physical altercation between the grandmother and D.C.  At the March 3, 2015 hearing, the Agency and minor's counsel represented that mother had indeed been living at the maternal grandmother's home contrary to court order, and objected to visitation based on the minors' need for stabilization.  The juvenile court temporarily suspended visitation pending a full hearing.

### 1.1 *March 12, 2015 Order*

The March 12, 2015 order temporarily suspending visitation was a proper exercise of the juvenile court's discretion.  At the time of the March 12, 2015 hearing, mother's reunification services had been terminated but no section 366.26 hearing had been ordered.  In assessing the best interests of the child in that context, the juvenile court's paramount consideration is the needs of the child for permanence and stability.  (*In re Stephanie M., supra*, 7 Cal.4th at p. 317; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  In that regard, the court heard representations from the Agency that mother had been living

17

with the minors in the maternal grandmother's home in Idaho and, since returning to California, had been visiting with the minors. As a result, A.M. was "aggressive," and D.C. was "not settling down, going AWOL," and not attending school. Minors' counsel also represented that both minors needed to be stabilized before participating in further visitation, including getting them settled in their new placement, getting A.M. into counseling, and working on D.C.'s attendance in school.

Mother's counsel disputed the claim that mother had been living at the maternal grandmother's home in Idaho and argued she frequently visited the minors there and the minors "seemed to be doing fine" with the exception of D.C.'s behavioral issues and the physical altercation between D.C. and grandmother (during which mother was not present) requiring police intervention.

Finding the case had "a lot of history and turmoil" and the minors needed time to "therapeutically" adjust to the change in placement, the juvenile court temporarily suspended visitation with both minors pending the next hearing on May 12, 2015.

Mother disputes the representations of the Agency and minors' counsel—in particular, statements that she lived in the maternal grandmother's home in Idaho with the minors, and statements regarding the instability of the minors' behavior following removal from grandmother's home in Idaho—as unsworn statements that do not constitute evidence. Mother argues that, short of those unsworn statements, there was no evidence offered to demonstrate visitation would be detrimental to the minors.

While it is true that unsworn statements of counsel are not evidence, the representations of minors' counsel are vital to the court's inquiry regarding what is in the best interests of the minors. The primary responsibility of minors' counsel is to "advocate for the protection, safety, and physical and emotional well-being" of the minors. (§ 317, subd. (c)(2).) In carrying out that responsibility, minors' counsel "may . . . make recommendations to the court concerning the [minors'] welfare, and participate

18

further in the proceedings to the degree necessary to adequately represent the [minors]." (§ 317, subd. (e)(1); see *id.*, subd. (e)(2).) Minors' counsel properly did so here.

The court was presented with prima facie evidence that temporary suspension of visitation was in the best interests of the minors under the existing circumstances. In the absence of a status review report, the court considered the statements and representations of the Agency, minors' counsel, and mother's counsel and resolved any disputes in the evidence adversely to mother. Given the traumatic upheaval of the minors' living situation, their recent removal from their maternal grandmother's home in Idaho and transfer to their new placements in California, and factors such as the minors' behavioral issues and mother's recent failure to abide by the court's orders regarding contact with the minors, we find the order for the temporary suspension of visitation was neither arbitrary, capricious, nor patently absurd. Thus, we find no clear abuse of the juvenile court's discretion as to the March 12, 2015 order.

**1.2    *August 6, 2015 Order***

At the August 6, 2015 visitation review hearing, mother requested that the court withdraw the order suspending visitation with both minors. The Agency and minors' counsel informed the court of their concerns about possible improper communications between mother and D.C., as well as the risk of "destabilizing the placement," but agreed to one supervised visit per month with A.M. with the possibility of increased visits so long as A.M. did not become destabilized and mother acted appropriately. D.C. informed the court that she did not want visitation with mother.

Mother again requested visitation with both minors and more frequent visitation with A.M. As the court attempted to explain its reasoning, mother became argumentative, engaging in the following colloquy with the court:

"[THE COURT]: We are going to start off once a month, see how it goes. If we can build on that relationship and that is—you are not listening. You will miss the pearls of wisdom here. We have to start somewhere. That is going to be it.

"[MOTHER]: May I speak? I am the mom. I have a right to speak. I am the mom. I have the right to speak.

"[THE COURT]: I will have you removed.

"[MOTHER]: You are violating my rights.

"[THE COURT]: You have to meet with the decorum here in the courtroom. I am willing to set up visits with your son [A.M.] and see how it goes. I have no opposition to later increasing them or maybe even having them at your home. We will start out supervised visits at CAPC with the minor [A.M.] and see how it goes. If they go well, see how to increase . . . .

"[MOTHER]: I need a hearing for a new attorney please.

"[THE COURT]: We will talk about that when we come back.

"[MOTHER]: I am going to appeal that.

"[THE COURT]: [Mother], you are missing the entire discussion."

Mother was eventually removed from the courtroom for disruptive behavior. The court ordered supervised visitation with A.M., but no visitation with D.C.

Mother's request was, in effect, an oral motion pursuant to section 388 to modify the existing visitation order. Section 388, subdivision (a)(1) provides that a parent of a dependent child may petition the juvenile court "upon grounds of change of circumstance or new evidence . . . for a hearing to change, modify, or set aside any order of court previously made . . . ." Section 388 permits modification of a dependency order if a

20

change of circumstance or new evidence is shown and if the proposed modification is in the best interests of the minor. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.)

The party petitioning for modification has the burden of proof by a preponderance of the evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 48.) The best interests of the child are of paramount consideration when a petition for modification is brought after termination of reunification services. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) In assessing the best interests of the child, the juvenile court looks to the needs of the child for permanence and stability. (*Ibid.*) A modification petition "is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.)

Here, the court modified its previous order and granted visitation between mother and A.M. While mother takes issue with the frequency of visits, the conservative visitation order was a reasonable means to achieve the goal of maintaining A.M.'s stability, particularly in light of mother's history of, and continuing inability to refrain from, disruptive outbursts and improper communications with one or both of the minors. We find no clear abuse of discretion as to the August 6, 2015 order regarding A.M.

We reach a different result with regard to D.C. As we previously concluded, the March 12, 2015 order temporarily suspending visitation with D.C. was appropriate. However, because mother's case plan included a visitation order, that temporary suspension could not continue indefinitely. That is, in order to continue the suspension or deny visitation altogether, the juvenile court needed to make a finding of detriment regardless of whether mother met her burden under section 388. (See §§ 362.1 [visitation while minor in foster care], 366.21, subd. (h) [visitation pending § 366.26 hearing], 362.4 [court's power to order visitation on termination of dependency], 366.3, subd. (e)(4) [court's power to order services in minor's best interests]; *In re David D.* (1994) 28 Cal.App.4th 941, 954 [where a parent has been denied reunification services,

21

visitation is still required absent a finding of detriment]; *In re Elizabeth M.* (1991) 232 Cal.App.3d 553, 564; *In re Kristin W.* (1990) 222 Cal.App.3d 234, 248.) No such finding was made.

While we may infer detriment where the evidence is unequivocal, we cannot do so where, as here, the evidence is at best conflicting. For example, the most recent (May 14, 2015) status review report noted there had been no visitation with mother since D.C.'s return to California in February 2015 (contrary to prior representations by the Agency), but stated D.C. was requesting visitation. At the hearing, D.C. informed the court she did *not* want visitation with mother. The status review report chronicled D.C.'s considerable emotional and behavioral problems while in Idaho, including angry outbursts and unpredictable violent tantrums, and indicated she was not cooperating with mental health service providers. At the August 6, 2015 hearing, the Agency and minors' counsel did not discuss D.C.'s behavioral status as of the last report or how that might impact visitation, but instead expressed concern that there had been improper communications between mother and D.C. and discussed issues regarding D.C.'s placement and school attendance, noting her current placement had the "ability to do supervised therapeutic family visits on Mondays and Wednesdays" and would be "more than happy to make that available for [D.C.] and her mother to see how it goes." Mother provided no helpful information at the hearing and instead became disruptive and was eventually removed from the courtroom.

The only fact made clear at the hearing was D.C.'s desire not to have visitation with mother. However, while a child's aversion to visitation with a parent may be considered, it may not be "the *sole* factor" in determining visitation. (See *In re Julie M.* (1999) 69 Cal.App.4th 41, 50-51.) Thus, the juvenile court could not, in the absence of a finding of detriment, delegate the decision whether or not to allow visitation to D.C. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1373-1377.)

22

Given that there is a conflict in the evidence we cannot resolve, we must remand the matter to the juvenile court to make appropriate findings of detriment regarding visitation between mother and D.C.

### 1.3 *September 17, 2015 Order*

At the September 17, 2015 hearing, mother requested visitation with D.C., increased visitation with A.M., and visitation between A.M. and "his father" (mother's boyfriend). Mother argued visitation between A.M. and mother's boyfriend should be allowed because the boyfriend "raised him from a baby," "went to every visit" for a whole year, "has been involved from day one," and "is the only dad he knows." She made no argument regarding her own visitation with either A.M. or D.C. The court denied the request.

Mother provided no evidence of a change of circumstance or that the proposed modification was in the best interests of either minor as required by section 388 to modify the existing visitation order. (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 526.) As such, the juvenile court did not abuse its discretion in denying mother's request to modify (increase) visitation as to A.M.

In light of our remand of the August 6, 2015 order as to D.C., however, we remand the September 17, 2015 order as to D.C. as well and direct the juvenile court to make appropriate findings and orders as necessary.

## 2.0 Ineffective Assistance of Counsel

Next, mother contends her court-appointed counsel was prejudicially ineffective in failing to request a continuance of the May 14, 2015 hearing on the ground of improper notice and not having received the report prior to the hearing. She also claims she was entitled to an inquiry on her request for "a hearing for a new attorney." The claims lack merit.

23

"Under the standard test for a claim of ineffective assistance of counsel, [a parent] is required to demonstrate both that counsel's representation fell below an objective standard of reasonableness and resulting prejudice. [Citation.] A violation of the right of effective counsel is reviewed under the test of harmless error. [Citation.] 'Thus the parent must demonstrate that it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*In re N.M.* (2008) 161 Cal.App.4th 253, 270.)

"In general, the proper way to raise a claim of ineffective assistance of counsel is by writ of habeas corpus, not appeal." (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1.) That is because "[t]he establishment of ineffective assistance of counsel most commonly requires a presentation which goes beyond the record of the trial [and] . . . [a]ction taken or not taken by counsel at a trial is typically motivated by considerations not reflected in the record." (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 243.) Unless there simply could be no satisfactory explanation for trial counsel's tactics, a party alleging ineffective assistance of counsel cannot seek review of his or her claim by way of direct appeal. (*In re Darlice C.* (2003) 105 Cal.App.4th 459, 463.)

Here, it is not hard to imagine reasons why counsel did not request a continuance for lack of sufficient notice or timely service of the report. Counsel was present, had read the report, and was capable of adequately representing mother's interests in her absence. And, in light of mother's disruptive outbursts at prior hearings, counsel may have made a calculated decision to let the hearing proceed in her absence.

Likewise, mother cannot establish prejudice. Mother was well aware of the May 14, 2015 hearing date. Her counsel attended and participated in the March 3, 2015 hearing, at which the juvenile court temporarily denied visitation without prejudice and set the matter for review on March 12, 2015. The court's minute order states, "5-14-15 [h]earing remains as set."

Mother appeared with her counsel at the March 12, 2015 hearing. The Agency noted the next review hearing was May 14, 2015, and the court's minute order states the periodic review of permanent plan was set for May 14, 2015 at 1:30 p.m. in department 16.

Mother's counsel appeared at the May 14, 2015 periodic review hearing and submitted on the status review report (a copy of which was served on mother via first-class mail on May 13, 2015) without prejudice.

Mother argues she was denied the opportunity to request contested proceedings, receive legal advice, and challenge allegations in the status report and statements made by the social worker, and claims it is reasonably probable she would have achieved a more favorable result had counsel requested the continuance. The claim is untenable.

Mother was represented by her attorney at the May 14, 2015 hearing, the purpose of which was not to discuss visitation, but rather D.C.'s progress in her placement, counseling, and school. The juvenile court adopted the social worker's recommendation that the permanent plan of planned permanent living arrangement remain a viable plan for D.C. and A.M., and ordered that all prior orders remain in full force and effect.

The issue of visitation was raised at the subsequent status review hearing on July 30, 2015, and continued to August 6, 2015, at the request of mother's counsel to allow the matter to be heard by Judge Lucaccini. Mother attended the August 6, 2015 hearing. She requested modification of the visitation order and was argumentative, but did not raise any issue regarding late receipt of the status report, nor did she object to the report itself. At that time, the court ordered supervised visitation with A.M.

What more favorable result mother might have obtained is unclear. The juvenile court ordered monthly supervised visitation with A.M. and indicated the frequency of visits could increase depending upon how those visits went. Given the history of the case

and A.M.'s need for stability, it is not reasonably probable mother would have achieved a more favorable visitation order regarding A.M. In light of our decision to remand for further findings and orders as to D.C., we need not decide whether the same is true regarding her.

Finally, we reject mother's claim that the court's decision at the August 6, 2015 hearing not to inquire further regarding her request for "a hearing for a new attorney" is somehow a basis for her ineffective assistance of counsel claim.

In any event, the record strongly suggests that mother routinely requested a new attorney when she was dissatisfied with certain aspects of the proceedings or the court's orders. In that regard, we note that on two prior occasions, mother expressed her displeasure with the court's rulings and her attorney at the time and made an oral *Marsden* motion. The court conducted hearings, one on August 27, 2013 (regarding her first public defender, Charles Anderson), and the other on March 6, 2014 (regarding her second public defender, Michelle Turner), and denied the motions. Here again, like the two previous motions, mother requested "a hearing for a new attorney" (regarding her third public defender, Damon Williams) as she expressed her displeasure with the court's ruling ordering visitation with A.M. but not with D.C. While the visitation order might not have been to mother's liking, it is not likely under these circumstances that a different attorney would have convinced the court to order more frequent visitation.

**3.0    Conflict of Interest of Minors' Counsel**

Mother contends minors' counsel had an unavoidable conflict of interest in representing both A.M. and D.C. because the two were "estranged siblings with dramatically different interests and needs." We disagree.

"When first appointing counsel [for multiple siblings] in a dependency matter, the court may generally appoint a single attorney to represent all the siblings. It would have

26

to appoint separate attorneys if, but only if, there is an actual conflict among the siblings or if circumstances specific to the case—not just the potential for conflict that inheres in all multisibling dependency cases—present a reasonable likelihood an actual conflict will arise." (*In re Celine R.* (2003) 31 Cal.4th 45, 58.)

"The following circumstances, standing alone, do not necessarily demonstrate an actual conflict of interest:  [¶]  (i) The siblings are of different ages;  [¶]  (ii) The siblings have different parents;  [¶]  (iii) There is a purely theoretical or abstract conflict of interest among the siblings;  [¶]  (iv) Some of the siblings are more likely to be adopted than others;  [¶]  (v) The siblings have different permanent plans;  [¶]  (vi) The siblings express conflicting desires or objectives, but the issues involved are not material to the case; or  [¶]  (vii) The siblings give different or contradictory accounts of the events, but the issues involved are not material to the case." (Cal. Rules of Court, rule 5.660(c)(2)(B); see *In re Zamer G.* (2007) 153 Cal.App.4th 1253, 1268.)  "A conflict arises where minor's counsel seeks a course of action for one child with adverse consequences to the other." (*In re Barbara R.* (2006) 137 Cal.App.4th 941, 953.)

The failure to appoint separate counsel for separate siblings is subject to the harmless error review.  (*In re Celine R.*, *supra*, 31 Cal.4th at p. 59.)

As a preliminary matter, we note that mother never raised this issue in the juvenile court.  In any event, mother argues here that an actual conflict existed due to the following:  A.M. said D.C. was lying about the assault by mother that initiated the dependency proceedings; A.M. and D.C. had different experiences while in Idaho and differing perceptions of what occurred in Idaho; the level of estrangement between the two siblings was so intense it prevented visitation between the whole family; and D.C. was jealous of the attention A.M. received from mother.  Even assuming these facts to be true, none are evidence of an actual conflict.

27

The fact the minors maintained disparate views on and reacted differently to people and events, had periods of estrangement, and had different wants and needs at any given time over the course of the dependency, does not indicate a conflict. "[T]he paramount duty of counsel for minors is not zealously to advocate the *client's* objectives, but to advocate for what the *lawyer* believes to be in the client's best interests, even when the lawyer and the client disagree." (*In re Zamer G., supra*, 153 Cal.App.4th at p. 1265; see *In re Candida S.* (1992) 7 Cal.App.4th 1240, 1253 ["[T]he obligation of counsel for a dependent minor is to pursue whatever is in the minor's best interest. This may or may not be what the minor wishes."].) Minors' counsel advocated zealously for each minor, despite whether the best interests of one differed from those of the other. For example, minors' counsel recommended that the juvenile court order supervised visitation with A.M., who was doing well in his placement and whose emotional and behavioral status had stabilized, but not with D.C., who continued to struggle with issues with her placement, failure to attend school, and general emotional and behavioral problems. The fact that counsel advocated for two different courses of action is not evidence that only one of the minors benefited while the other suffered adverse consequences.

Finally, mother argues the existence of a conflict is evidenced by the admission of minors' counsel that she recommended against visitation without first having spoken with A.M., and the fact that A.M. was not given the opportunity to address the court at the September 17, 2015 hearing. Again, we disagree.

At the time of the March 3, 2015 hearing, A.M. (then, just nine years old) and D.C. had just been removed from the home of the maternal grandmother in Idaho following a physical altercation between grandmother and D.C. and reports that mother had been living at grandmother's home contrary to court order. After having been placed together in Idaho and having made positive progress in their sibling relationship, the minors were now residing in new environments and in separate placements. In light of

28

that information and "considering everything that's going on," minors' counsel sought the course of action she felt was in the best interests of both minors—to recommend that visitation with mother be suspended until things stabilized. Counsel's decision not to consult with her nine-year-old client prior to making the recommendation, or to have him address the court at that hearing, does not reflect a conflict; rather, it is a tactical decision to which we accord great deference, particularly in light of the minor's tender age.

Under the circumstances, no actual conflict existed and separate counsel was not required for A.M. and D.C.

## DISPOSITION

The juvenile court's March 12, 2015, August 6, 2015, and September 17, 2015 orders are affirmed as to A.M. The March 12, 2015 order is affirmed as to D.C. The August 6, 2015 and September 17, 2015 orders are reversed as to D.C. and remanded to the juvenile court to make appropriate findings and orders regarding visitation between D.C. and mother consistent with this opinion.


                                                                   BUTZ           , Acting P. J.


We concur:


      MAURO          , J.


      RENNER         , J.